Ben **NOYAKUK**, Appellant,

v.

**STATE of Alaska,** Appellee.

No. A–8442.

Court of Appeals of Alaska.

Jan. 20, 2006.

Gregory S. Parvin and Robert D. Lewis of Lewis & Thomas, Nome, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

In March 2001, Ben Noyakuk shot and killed his girlfriend, Martha Butler. A jury ultimately convicted him of first-degree murder for this homicide.

At Noyakuk's trial, the State relied on various statements that Noyakuk made to

the state troopers about the homicide. Noyakuk made these statements during a series of interviews that took place at the Anvil Mountain Correctional Center. Noyakuk was incarcerated at this correctional center as a result of his arrest on April 12, 2001 for two misdemeanors and a probation violation, all unrelated to the homicide.

The superior court found that the troopers had violated Noyakuk's *Miranda* rights at the first interview, so the superior court suppressed Noyakuk's statements from that interview.[1] However, the superior court concluded that Noyakuk's statements from the subsequent interviews were not tainted by this *Miranda* violation—because, at these subsequent interviews, Noyakuk received proper *Miranda* warnings and waived his rights, and because Noyakuk's statements at these subsequent interviews were voluntary. The superior court thus ruled that the State could rely on Noyakuk's statements from these subsequent interviews.

For the reasons explained here, we agree with the superior court's resolution of these questions, and we therefore affirm Noyakuk's conviction.

### Underlying facts

In early 2001, Ben Noyakuk and his girlfriend, Martha Butler, were living in Nome. On April 1, 2001, Butler's father contacted the Nome police to report that his daughter was missing. Eleven days later, on April 12th, Thomas Noyakuk (Ben Noyakuk's brother) informed the police that Ben had told him that he had accidentally shot and killed Butler, and that he had hidden her body near the Penny River.

Based on this information, the Nome police called the Alaska State Troopers and, together, they began searching for Noyakuk. They found Noyakuk as he was traveling by snowmachine from Nome to Teller. Noyakuk was intoxicated, and he had a rifle with him.

Noyakuk was arrested for driving while intoxicated,[2] for possession of a firearm while intoxicated,[3] and for violating the conditions

of his probation from an earlier criminal conviction (by drinking alcoholic beverages). However, Noyakuk was not charged with any crime in connection with the homicide. At the time of his arrest, Noyakuk was advised of his *Miranda* rights, but he was not interrogated. He was taken to the Anvil Mountain Correctional Facility.

Within an hour of his arrival at the correctional facility, Noyakuk was placed on "suicide watch"—*i.e.*, he was placed in administrative segregation, and corrections officers took away his clothing, so that he had only a mattress and a blanket in his cell. Prisoners on "suicide watch" are not allowed any visitors except for their attorney—and, because Noyakuk had no attorney yet, this meant that he was being held *incommunicado*.

Noyakuk was still on suicide watch the next morning (April 13th), when two state troopers—Jane Schied and Terry Shepherd—came to the correctional center to interview Noyakuk about Martha Butler's death. Corrections officers allowed Noyakuk to dress, and then they took Noyakuk to a small room adjacent to the correctional center's booking office, where the two troopers were waiting.

The troopers informed Noyakuk that he did not have to talk to them, and that he was free to leave (*i.e.*, terminate the interview and return to his cell) at any time. In addition, when Noyakuk asked about getting an attorney, the troopers told him that he could have an attorney present during the interview if he wished, and that they would delay the interview in that case. However, the troopers did not give Noyakuk the full set of *Miranda* warnings before they began to question him.

During this first interview, Noyakuk told the troopers that he had accidentally shot Butler and that, after she died, he wrapped her body in a blanket and buried her under a snowbank near the Penny River.

On the afternoon of April 13th (*i.e.*, a few hours after Noyakuk's first interview with

---

**1.** See *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** AS 28.35.030(a).

**3.** AS 11.61.210(a)(1).

the state troopers), Noyakuk was brought to court and arraigned on the misdemeanor charges. An attorney was appointed to represent him on those charges (as well as the probation violation).

Trooper Schied returned to the correctional center in the early evening of April 15th to conduct a second interview with Noyakuk. That is, this second interview took place a little over 48 hours after the initial interview and Noyakuk's ensuing court arraignment. This time, Schied gave *Miranda* warnings to Noyakuk, and he waived his rights.

At this second interview, Noyakuk presented basically the same account of the shooting (*i.e.*, that it was an accident), but his description of events varied in some details, and Schied believed that some portions of Noyakuk's account were unlikely or did not make sense. When Schied tried to pin Noyakuk down on some of these discrepancies, Noyakuk became "shook up". He told Schied that he was going to end the interview, and Schied responded that this was his right. But before Noyakuk left the interview room, he told Schied, "You know where I am if you have any more questions." Schied understood this to mean that Noyakuk did not object to being interviewed again at a later time.

Schied's third interview with Noyakuk took place in the mid-afternoon of April 16th. Schied testified that she went to the correctional center shortly after noon on the 16th, intending to interview Noyakuk, but when she arrived, she discovered that Noyakuk had just had an interview with a mental health worker and he was emotionally upset. Even though Noyakuk told Schied that he was willing to speak to her, Schied declined to interview Noyakuk at that time. Instead, she advised Noyakuk that it would be better if he got some rest first. Schied left the prison and returned two hours later, at which time she conducted her third interview with Noyakuk. Again, she *Mirandized* Noyakuk, and Noyakuk waived his rights.

During this third interview, Noyakuk admitted that the shooting had not been an accident. Noyakuk told Schied that he shot Butler as she lay on a couch with her eyes closed (apparently unconscious). Noyakuk

explained that he shot Butler because he believed that she was going to leave him. Noyakuk also informed Schied that he would be willing to help the troopers look for Martha Butler's body. Schied told Noyakuk that she would forward this offer to her superiors.

Schied contacted Noyakuk again on the morning of April 17th (again, with *Miranda* warnings). She informed Noyakuk that the troopers did want Noyakuk's assistance in searching for Martha Butler's body, and that the troopers would return to the prison the following day (April 18th) to come get him. When the troopers returned the next day, they *Mirandized* Noyakuk, and then they transported him by helicopter to the Penny River, where they located the body.

Two weeks later, the Nome grand jury indicted Noyakuk for first-degree murder.

*Noyakuk's motion to suppress his statements to the troopers*

Following his indictment, Noyakuk asked the superior court to suppress the statements he made at the initial interview on April 13th because Schied and Shepherd had not fully advised him of his *Miranda* rights. Noyakuk also asserted that the troopers had failed to honor his request for an attorney at the April 13th interview, and that this constituted an independent basis for suppressing his statements from that first interview under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

Noyakuk also sought suppression of the statements he made at the subsequent interviews, arguing that these subsequent interviews were all tainted by the *Miranda* violation and the *Edwards* violation at the initial interview. And, finally, Noyakuk sought suppression of all physical evidence derived from these interviews.

Following an evidentiary hearing, Superior Court Judge Ben J. Esch agreed with Noyakuk that the troopers had interrogated him in violation of *Miranda* at the first interview. Judge Esch therefore suppressed the statements Noyakuk made at that initial interview. However, Judge Esch concluded that Noyakuk's statements from the subsequent interviews were admissible despite the initial

*Miranda* violation. Judge Esch reached this conclusion because he found that (1) all of Noyakuk's statements were voluntary for Fifth Amendment purposes, and (2) Noyakuk was fully advised of his *Miranda* rights, and waived those rights, prior to each of the subsequent interviews.

With regard to the asserted *Edwards* violation (*i.e.*, failure to honor a suspect's request for an attorney), Judge Esch found that Noyakuk made only an equivocal request for an attorney when Noyakuk said, "Shouldn't I just have my attorney with me, or something?" Judge Esch further found that Noyakuk was aware (at that time) of his right to the assistance of an attorney, due to his "[prior] experience with both attorneys and the justice system". As Judge Esch noted, Noyakuk was convicted several times in the 1980's of minor consuming alcohol, and was convicted once of disorderly conduct in the 1990's. Moreover, in the year preceding his arrest in April 2001, Noyakuk was convicted three times of domestic assault.

Judge Esch also found that the troopers had responded appropriately to Noyakuk's equivocal request for an attorney: they repeatedly explained to Noyakuk that it was up to him to decide whether he wished to speak to them without an attorney, and they asked Noyakuk to clarify whether he was willing to speak to them without an attorney. Only after Noyakuk expressly stated that he was willing to be interviewed without an attorney did the troopers commence their substantive questioning about the homicide. Under these facts, Judge Esch concluded, the troopers had not violated the rule of *Edwards v. Arizona*.

### A more detailed look at the first interview

As explained above, Noyakuk was arrested and placed at the Anvil Mountain Correctional Center on April 12, 2001. However, he was not charged with any crime arising from the homicide of Martha Butler. Rather, Noyakuk was arrested on charges of driving while intoxicated and possession of a firearm while intoxicated, as well as for violating his probation (by drinking).

Troopers Schied and Shepherd came to the correctional center the next day to interview Noyakuk about the homicide. At the beginning of this interview, the following colloquy took place between Trooper Shepherd and Noyakuk:

*Shepherd:* Okay. Ben, you know we're here to talk to you today. Ah, we're not here to arrest you for anything else. Um, you know you—you don't have to talk to us if you don't want to. Um, you know, you—you can, you know, go tell the correctional officers any time that you want to go back to your cell, that you can. Okay, you understand that?

*Noyakuk:* Uh-huh [yes].

A few moments later, Shepherd reiterated that Noyakuk could leave the interview any time he wished:

*Shepherd:* Okay. Well, like I said, we're not here to talk to you about any of your charges from yesterday.

*Noyakuk:* Uh-huh.

*Shepherd:* You understand that.

*Noyakuk:* Uh-huh.

*Shepherd:* Okay. Like I said, you know, you—you're not under arrest for anything here. We're not here to charge you with anything. Um, and again, we're going to talk to you about some stuff, and at any time you don't want to talk about it, you can leave. That's up to you, okay?

*Noyakuk:* Okay.

Trooper Schied then informed Noyakuk that she and Shepherd wanted to speak to him about Martha Butler's death. The following colloquy ensued:

*Schied:* So that's what we'd like to talk to you about. We know you've been through a lot with Martha.

*Noyakuk:* Uh-huh.

*Schied:* We know that, when she gets intoxicated, she can get very, very hostile—very, very mad and very mean. We understand those things. But [do] you suppose you can help us out with this situation, Ben?

*Noyakuk:* Probably.

*Schied:* Okay. Can you kind of tell us what happened, so [that] we can help her parents and you, too?

*Noyakuk:* Shouldn't I just have my attorney with me, or something?

*Schied:* Umh . . .

*Shepherd:* Well, if, if that's what you feel [is] right—I mean, we can't make that decision for you. You have to make that decision. Like I said, . . . we're not here to talk about the [pending] charges; we're here to talk about Martha. . . . Like I said, you know, you don't have to talk to us if you don't want [to]. But, ah, like Trooper Schied said, we're trying to figure out what happened so that we can help her parents, you know, get over this, and adjust to it, and . . .

*Noyakuk:* Uh-huh.

*Shepherd:* . . . and try to find out, you know, what actually happened. Because we always know [that] there's two sides to the story. . . . There's your side, [and] we've been talking to a lot of people, and we've heard what they've been saying, and what you told them. But from our work, we know that there's two sides to the story, and the best place to always hear the story is from the person [who] actually . . . was there. So [you] know, like I said, you—you can talk to us if you want. If—if you want an attorney, that's fine, too.

*Noyakuk:* Uh-huh.

*Shepherd:* Ah, but that's up to you. You need to make that decision and let us know.

*Noyakuk:* Uh-huh.

*Schied:* Because that attorney can't help us find where Martha is, to help her parents. You know, he's not the one that can help you do that. He's not the one that can help us help [Martha's] parents.

*Noyakuk:* Uh-huh.

*Schied:* But if that's what you feel—like Investigator Shepherd says, that's your choice.

*Shepherd:* So it, it's something for you to decide, before we go further with anything, [with] any questioning.

*Noyakuk:* I don't know; I don't know how this (indiscernible).

*Schied:* You don't know what to say, Ben?

*Noyakuk:* Huh?

*Schied:* Would it help if we just asked [our] questions? Would [that] make it easier for you?

*Noyakuk:* I don't have to answer.

*Schied:* So you don't have to just, just spell it out, would it help you if we just ask questions?

*Noyakuk:* Okay.

*Schied:* Are you—are you willing to do that without an attorney, though? We need to know that.

*Noyakuk:* Yeah.

*Schied:* Okay. Um, were you up . . . by John Ahmasuk's camp when [Martha] was shot?

*Noyakuk:* No, I was in my house.

*Schied:* You were in your house?

*Noyakuk:* Uh-huh [yes].

*Schied:* Okay. Would—okay.

*Noyakuk:* It was accidental.

*Schied:* Okay. Well, those things happen, Ben.

*Shepherd:* Those [things] happen.

*Schied:* Was, was this . . .

*Shepherd:* Ben, would you even feel better, you know, if—if we read you your rights? Would you feel better if we did that first? Or . . .

*Noyakuk:* Unh-uh [no].

*Shepherd:* No, it's okay? So you are willing to talk to us; it's okay? [Are] you willing to talk to us without an attorney?

*Noyakuk:* Uh-huh [yes].

*Shepherd:* I'm sorry; I couldn't hear you.

*Noyakuk:* Yes.

[The troopers then resumed their substantive questioning.]

*Was Noyakuk in custody for Miranda purposes during the first interview (the interview on the morning of April 13th)?*

█ When this case was first briefed, the State did not dispute that Noyakuk was in custody for *Miranda* purposes during the interview of April 13th and that troopers failed to give Noyakuk adequate *Miranda* warnings at that time. We nevertheless

asked the parties for supplemental briefing on the issue of whether Noyakuk was truly in custody for *Miranda* purposes during that April 13th interview, given the troopers' repeated statements to Noyakuk that he was not obliged to speak to them, and that he could leave the interview at any time. The parties responded with well-written briefs on this question. Having considered the matter, we agree with Judge Esch that Noyakuk was in custody for *Miranda* purposes.

In *Beaver v. State*, 933 P.2d 1178, 1185 (Alaska App.1997), we held that even when the police interrogate a prison inmate, a finding of "custody" for *Miranda* purposes still requires proof of coerciveness. And there is a significant body of case law from other jurisdictions supporting the view that a prison inmate who is interviewed by the police about an unrelated offense will not be deemed to be in *Miranda* custody if the interviewing officers make it clear that the inmate need not participate in the interview, that the inmate can choose to terminate the interview at any time, and that the inmate will suffer no adverse consequences if the inmate decides not to answer the officers' questions.[4]

But in all of these cases, the interrogated inmate had already been convicted and sentenced or, at the least, the inmate had already been incarcerated for weeks before being questioned by the police. In other words, the defendants in those cases were in their accustomed environment when the police approached them and asked them to submit to an interview—and the defendants knew that if they chose to end the interview, they would be returned to that accustomed environment.

Noyakuk's case stands in sharp contrast. Noyakuk had been in jail for less than a day. He had been held *incommunicado* during that time. Naked in a solitary cell, and denied visitors, he had not yet appeared before a judicial officer, and he had received no legal advice. This was not a situation where a prison inmate was interviewed in their prison "home". Noyakuk was just as susceptible to the inherent coercive pressures of the interrogation process as any new arrestee. The troopers could not have interrogated Noyakuk following his arrest on the evening of April 12th without first obtaining a *Miranda* waiver. We conclude that the situation was no different at ten o'clock the next morning.

Because Noyakuk was in custody when the troopers came to interview him on April 13th, and because Noyakuk did not receive the complete set of *Miranda* warnings at that time, we uphold the superior court's decision to suppress Noyakuk's statements from that interview.

*Why we conclude that the Miranda violation at the April 13th interview did not taint the statements that Noyakuk gave at the later interviews*

█ When Judge Esch ruled on Noyakuk's suppression motion, he declared that he would have suppressed all of Noyakuk's statements if Noyakuk's case had been governed by the law as it existed before the United States Supreme Court issued its decision in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). However, Judge Esch concluded that, under post-*Elstad* law, Noyakuk's statements at the subsequent interviews were not tainted by the

4. Federal courts: *See United States v. Chamberlain*, 163 F.3d 499, 501–02 (8th Cir.1998); *United States v. Menzer*, 29 F.3d 1223, 1231–32 (7th Cir.1994); *United States v. Turner*, 28 F.3d 981, 983–84 (9th Cir.1994); *Garcia v. Singletary*, 13 F.3d 1487, 1492 (11th Cir.1994); *United States v. Lugo*, 289 F.Supp.2d 790, 794–96 (S.D.Tex. 2003); *Dallio v. Spitzer*, 170 F.Supp.2d 327, 338–39 (E.D.N.Y.2001).

State courts: *See Fairchild v. State*, 349 Ark. 147, 76 S.W.3d 884, 890 (2002); *People v. Denison*, 918 P.2d 1114, 1116–17 (Colo.1996); *State v. Peterson*, 663 N.W.2d 417, 427–28 (Iowa 2003); *State v. Deases*, 518 N.W.2d 784, 789

(Iowa 1994); *Commonwealth v. Larkin*, 429 Mass. 426, 708 N.E.2d 674, 681 (1999), and the cases cited in footnotes 6–8 of *Larkin*; *State v. Tibiatowski*, 590 N.W.2d 305, 308–09 (Minn. 1999); *State v. Ford*, 144 N.H. 57, 738 A.2d 937, 943 (1999); *State v. Conley*, 574 N.W.2d 569, 573–74 (N.D.1998).

See also Judge Bryner's dissenting opinion in *Kochutin v. State*, 813 P.2d 298, 309 & n. 2 (Alaska App.1991), where he cited the "wealth of authority ... that a sentenced prisoner serving time in a correctional facility is not *ipso facto* in *Miranda* custody".

*Miranda* violation that occurred at the first interview.

In both *Halberg v. State* and *Crawford v. State*,[5] we described and examined the difference between pre- and post-*Elstad* law on the issue of whether a *Miranda* violation in one interrogation requires suppression of the statements the suspect makes in ensuing interrogations. As we explained in *Crawford,*

> [The] two competing analyses of this question [are] the [pre-*Elstad*] "dissipation of taint" analysis exemplified by the United States Supreme Court's decision in *Brown v. Illinois*,[6] and the modified analysis announced in 1985 by the Supreme Court in *Oregon v. Elstad.*
>
> Under *Brown,* even though a suspect ultimately receives proper *Miranda* warnings, the statements that the suspect makes after receiving those *Miranda* warnings are still presumptively inadmissible; to rebut this presumption, the government must show that there was a "break in the chain of events" to insulate those later statements from the taint of the suspect's initial unwarned admissions. [*Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62.] But under *Elstad,* the later administration of *Miranda* warnings presumptively negates the psychological pressures of custodial interrogation from that point forward, thus rendering the suspect's ensuing statements admissible despite the fact that the suspect had earlier made incriminating admissions. In the words of the *Elstad* Court, "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the [earlier] unwarned statement inadmissible", even when there has been no significant break in the stream of events as required under *Brown.* [*Elstad,* 470 U.S. at 310–11, 105 S.Ct. at 1294.]

*Crawford,* 100 P.3d at 441.

Judge Esch recognized that neither this Court nor the Alaska Supreme Court has yet decided whether, as a matter of state law, Alaska should follow *Elstad* or should instead adhere to pre-*Elstad* law. However, Judge Esch concluded that, because Alaska has not affirmatively adopted a contrary rule, he should follow the rule expounded in *Elstad.*

We do not necessarily agree with Judge Esch's conclusion that, under pre-*Elstad* law, Noyakuk's statements at the ensuing interviews were tainted by the *Miranda* violation at the first interview.

The flaw in the first interview was not a total failure to warn Noyakuk, but rather the fact that the troopers did not give Noyakuk the complete set of *Miranda* warnings. The most prominent omissions were (1) the troopers' failure to expressly tell Noyakuk that anything he said to them could be used against him, (2) the troopers' failure to tell Noyakuk that he had the right to have an attorney present during the questioning, and (3) the troopers' failure to expressly tell Noyakuk that, if he wanted an attorney but could not afford one, an attorney would be appointed to represent him before any questioning.

On the other hand, the troopers *did* tell Noyakuk (a) that they had come to speak to him about Martha Butler's death, (b) that he did not have to talk to the troopers if he did not wish to, and (c) that he could terminate the interview and return to his cell at any time he wished. Moreover, before Noyakuk answered any substantive question about the homicide, he brought up the subject of an attorney (by asking, "Shouldn't I just have my attorney with me, or something?"). At that point, the troopers expressly informed Noyakuk (d) that it was up to Noyakuk to decide whether to talk to them without the assistance of an attorney.

Judge Esch found that the troopers made a conscious decision not to give Noyakuk the complete *Miranda* warnings at this first interview, and this finding is supported by Trooper Schied's testimony to the grand jury. Schied testified that her (mistaken) understanding of the law was that law enforcement officers do not have to warn incarcerated suspects of their *Miranda* rights as long as the officers confine their questions to

5. *Halberg v. State,* 903 P.2d 1090 (Alaska App. 1995); *Crawford v. State,* 100 P.3d 440 (Alaska App.2004).

6. 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

crimes other than the ones for which the suspect has been jailed.

Judge Esch concluded that the troopers probably honestly believed that they were not obligated to *Mirandize* Noyakuk. However, Judge Esch also found that the troopers' decision to omit the full set of *Miranda* warnings was motivated by the troopers' "[fear] that if [Noyakuk] understood that he could stop [the] questioning at any time and/or consult with an attorney, they would not learn where [Martha Butler's] body was or what had happened."

 This latter finding, we conclude, is clearly erroneous.[7] As we have explained, the troopers expressly told Noyakuk that he did not have to speak to them, that he could stop the questioning at any time, and that it was up to him to decide whether to seek the assistance of an attorney before proceeding with the interview. We further note that, even after Noyakuk seemingly manifested his willingness to speak to the troopers without an attorney, Trooper Shepherd offered to give Noyakuk the complete set of *Miranda* warnings—an offer that Noyakuk declined.

For these reasons, we conclude that even though the troopers consciously decided not to give Noyakuk the complete set of *Miranda* warnings, their violation of *Miranda* was not flagrant or "purposeful" (in the sense that it stemmed from a desire to subvert Noyakuk's rights).[8]

We further note that, even though Noyakuk remained incarcerated throughout the series of interviews, his first interview (the flawed one) was separated from his second interview by more than 48 hours. (The second interview took place in the early evening of April 15th.) At the beginning of that 48-hour interlude, on the afternoon of April 13th, Noyakuk was arraigned in court on the

pending misdemeanor charges, and an attorney was appointed to represent him. Thus, Noyakuk had two days to consult with counsel before the second interview took place.

At this second interview, Noyakuk was *Mirandized,* and he initially consented to speak to Trooper Schied. As the interview progressed, however, Noyakuk became emotional, and he exercised his right to end the conversation—although he told Schied that she could return later to talk to him again.

We further note that, when Schied returned to the prison around noon the next day (April 16th) to interview Noyakuk for a third time, she declined to hold the interview because she discovered that Noyakuk was emotionally distraught—even though Noyakuk told Schied that he was willing to talk to her at that time. Instead, Schied left the prison and returned two hours later.

When we evaluate these circumstances in light of the factors listed in *Halberg v. State,* 903 P.2d at 1098, we are not sure that Noyakuk's statements from the ensuing interviews should be suppressed even under pre-*Elstad* law.

However, this point is moot. In Noyakuk's brief to this Court, he does not ask us to reject *Elstad* and apply the pre-*Elstad* rule of suppression as a matter of state law. Instead, Noyakuk contends that his statements from the ensuing interviews should be suppressed even under the *Elstad* rule—and that Judge Esch misapplied *Elstad* when he came to the opposite conclusion.

Noyakuk points out that, in the *Elstad* opinion, the Supreme Court stated that "*absent deliberately coercive or improper tactics in obtaining the [suspect's] initial statement,* the mere fact that a suspect has made an unwarned admission does not warrant a presumption [that the suspect's later statements

---

7. A finding of fact is "clearly erroneous" when it "leaves the [reviewing court] with a definite and firm conviction ... that a mistake has been made, although there may be evidence to support the finding." *Geczy v. LaChappelle,* 636 P.2d 604, 606 n. 6 (Alaska 1981), quoting *Mathis v. Meyeres,* 574 P.2d 447, 449 (Alaska 1978).

8. Compare *Lewis v. State,* 862 P.2d 181, 186–87 (Alaska App.1993), and *Gustafson v. State,* 854 P.2d 751, 756 (Alaska App.1993), where we held

that, for purposes of applying the suppression rule announced in *State v. Malkin,* 722 P.2d 943 (Alaska 1986), a conscious misstatement or omission in a search warrant application is "intentional" only if it was done in a "deliberate attempt to mislead" the issuing magistrate. (See also Judge Singleton's concurrence in *Davis v. State,* 766 P.2d 41, 47 n. 3 (Alaska App.1988), where he advocated this same interpretation of "intentional" for *Malkin* purposes.)

were compelled]." *Elstad,* 470 U.S. at 314, 105 S.Ct. at 1296 (emphasis added). Noyakuk argues that the troopers' approach to him in the first interview was the sort of deliberately coercive or improper tactic condemned in *Elstad*—and that, therefore, his statements during the later interviews should be suppressed even under the *Elstad* rule.

But to support this contention, Noyakuk relies primarily on Judge Esch's finding that the troopers purposely violated *Miranda* at the first interview because they "were afraid that if [Noyakuk] understood that he could stop [the] questioning at any time and/or consult with an attorney, they would not learn where [Martha Butler's] body was or what had happened." As we explained above, this finding is clearly erroneous. The troopers repeatedly told Noyakuk that he did not have to speak to them, that he could stop the interview at any time, and that, if he wished, he could seek an attorney's assistance before speaking to them.

It may be true, as Judge Esch found, that the troopers consciously decided not to give the full set of *Miranda* warnings to Noyakuk, acting from the honest (but mistaken) belief that Noyakuk was not entitled to *Miranda* warnings as long as the troopers confined their questions to the as-yet-uncharged homicide. But the facts of Noyakuk's case do not demonstrate flagrant misconduct or purposeful overreaching by the officers.

Moreover, the federal courts have interpreted *Elstad's* reference to "coercive tactics" as relating to "situations in which the tactics used in the first, improper interrogation had a coercive effect that led to the [suspect's] later admissions". *Brosius v. Warden, Lewisburg Penitentiary,* 278 F.3d 239, 249 (3rd Cir.2002). Chief among the decisions on this point are the Supreme Court's own decision in *Missouri v. Seibert,* 542 U.S. 600, 615–17, 124 S.Ct. 2601, 2612–13, 159 L.Ed.2d 643 (2004), and this Court's decision in *Crawford v. State,* 100 P.3d 440, 450 (Alaska App.2004).

In Noyakuk's case, there is little reason to think that the *Miranda* violation at the first interview, or the results of that violation, coerced Noyakuk into waiving his rights at the ensuing interviews. First, there was an interval of more than 48 hours between the flawed first interview and the second one. During that time, an attorney was appointed to represent Noyakuk on the pending misdemeanor and probation violation charges—an attorney who, assumedly, was also available to give Noyakuk advice on how to deal with the troopers who wished to question him about the homicide.

Second, Noyakuk was given *Miranda* warnings before each of the subsequent interviews, and he does not claim that he failed to understand these warnings. In fact, the second interview (the one on April 15th) ended when Noyakuk invoked his right to terminate the interview.

Finally, Noyakuk told the troopers at the first interview that the shooting had been an accident, and he continued to assert this version of events at the second interview. It was not until the third interview (*i.e.,* the second properly *Mirandized* interview) on April 16th that Noyakuk confessed to having purposely shot Butler.

For these reasons, we conclude that Noyakuk's case does not present an exception to the standard *Elstad* analysis.

■ Turning now to a standard *Elstad* analysis of this case, Judge Esch found that all of Noyakuk's statements to the troopers (including his statements at the initial interview on April 13th) were voluntary. The record fully supports the judge's ruling. Judge Esch also found that each of Noyakuk's ensuing interviews was preceded by a valid *Miranda* advisement and waiver, and Noyakuk does not dispute this. Moreover, as Judge Esch noted, the interval between Noyakuk's first flawed interview and his second interview was "a significant period"—more than 48 hours. We note that, toward the beginning of this 48–hour interval, Noyakuk appeared in court and received an attorney.

Judge Esch further found that Trooper Schied was never overbearing toward Noyakuk, nor did she ever use lies or trickery to influence Noyakuk's decisions to submit to the ensuing interviews. The record supports these findings.

Applying the rule of *Elstad*, we agree with Judge Esch that, despite the *Miranda* violation at the first interview, Noyakuk's statements from his subsequent interviews were admissible.

(We again note that we are not deciding whether to adopt the *Elstad* rule as a matter of state law. We are simply deciding the question of federal law that Noyakuk has raised.)

*Why we agree with Judge Esch that the troopers did not violate Edwards v. Arizona at the first interview*

■ Noyakuk argues in the alternative that, even if his statements from the subsequent interviews are admissible under *Elstad*, these statements should nevertheless be suppressed because, at the first interview, the troopers failed to honor his right to an attorney.

In *Edwards v. Arizona*,[9] the Supreme Court held that when a suspect in custody invokes their right to counsel, the police must stop questioning the suspect and must not re-initiate questioning until the suspect has had the opportunity to consult an attorney:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [A]n accused [who has] expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85. See also our discussion of this rule in *Kochutin v. State*, 813 P.2d 298, 303 (Alaska App.1991).[10]

**9.** 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

**10.** Our original opinion in *Kochutin* was later vacated, *see* 875 P.2d 778 (Alaska App.1994), because our decision rested on the false factual

In the present case, Noyakuk did not expressly invoke his right to counsel at the first interview. However, as explained above, Noyakuk did ask the troopers whether he should have an attorney with him during the interview. Noyakuk contends that the troopers responded inappropriately to his question, by making remarks that were intended to discourage him from asserting his right to have an attorney present.

To analyze Noyakuk's claim, we return to a detailed look at this portion of the first interview. After the troopers explained that they had come to interview Noyakuk about Martha Butler's death, and that Noyakuk did not have to talk to them (and that he could end the interview at any time), Trooper Schied asked Noyakuk to describe how Martha Butler met her death:

> *Schied:* Okay. Can you kind of tell us what happened, so that we can help her parents and you, too?
>
> *Noyakuk:* Shouldn't I just have my attorney with me, or something?
>
> *Schied:* Umh ...
>
> *Shepherd:* Well, if, if that's what you feel [is] right—I mean, we can't make that decision for you. You have to make that decision. Like I said, ... we're not here to talk about the [pending] charges; we're here to talk about Martha.... Like I said, you know, you don't have to talk to us if you don't want [to]. But, ah, like Trooper Schied said, we're trying to figure out what happened so that we can help her parents, you know, get over this, and adjust to it, and ...
>
> *Noyakuk:* Uh-huh.
>
> *Shepherd:* ... and try to find out, you know, what actually happened. Because we always know [that] there's two sides to the story.... There's your side, [and] we've been talking to a lot of people, and we've heard what they've been saying, and what you told them. But from our work, we know that there's two sides to the

premise that Kochutin had been continuously in custody between the time he invoked his right to counsel and the time the police re-interviewed him. However, our discussion of the *Edwards* rule remains good law.

story, and the best place to always hear the story is from the person [who] actually ... was there. So [you] know, like I said, you—you can talk to us if you want. If—if you want an attorney, that's fine, too.

*Noyakuk:* Uh-huh.

*Shepherd:* Ah, but that's up to you. You need to make that decision and let us know.

*Noyakuk:* Uh-huh.

*Schied:* Because that attorney can't help us find where Martha is, to help her parents. You know, he's not the one that can help you do that. He's not the one that can help us help [Martha's] parents.

*Noyakuk:* Uh-huh.

*Schied:* But if that's what you feel—like Investigator Shepherd says, that's your choice.

*Shepherd:* So it, it's something for you to decide, before we go further with anything, [with] any questioning.

*Noyakuk:* I don't know; I don't know how this (indiscernible).

*Schied:* You don't know what to say, Ben?

*Noyakuk:* Huh?

*Schied:* Would it help if we just asked [our] questions? Would [that] make it easier for you?

*Noyakuk:* I don't have to answer.

*Schied:* So you don't have to just, just spell it out, would it help you if we just ask questions?

*Noyakuk:* Okay.

*Schied:* Are you—are you willing to do that without an attorney, though? We need to know that.

*Noyakuk:* Yeah.

*Schied:* Okay. Um, were you up ... by John Ahmasuk's camp when [Martha] was shot?

*Noyakuk:* No, I was in my house.

*Schied:* You were in your house?

*Noyakuk:* Uh-huh [yes].

*Schied:* Okay. Would—okay.

*Noyakuk:* It was accidental.

*Schied:* Okay. Well, those things happen, Ben.

*Shepherd:* Those [things] happen.

*Schied:* Was, was this ...

*Shepherd:* Ben, would you even feel better, you know, if—if we read you your rights? Would you feel better if we did that first? Or ...

*Noyakuk:* Unh-uh [no].

*Shepherd:* No, it's okay? So you are willing to talk to us; it's okay? [Are] you willing to talk to us without an attorney?

*Noyakuk:* Uh-huh [yes].

*Shepherd:* I'm sorry; I couldn't hear you.

*Noyakuk:* Yes.

As can be seen from this quoted exchange, when Noyakuk asked, "Shouldn't I just have my attorney with me, or something?", the troopers responded by telling Noyakuk (1) that this was Noyakuk's decision to make; (2) that if Noyakuk wanted an attorney, "that [was] fine"; and (3) that Noyakuk needed to make this decision and "let [the troopers] know" before the interview proceeded further. When the troopers asked Noyakuk whether he was willing to speak to them without an attorney, Noyakuk stated (apparently three times) that he was.

However, the troopers interspersed this conversation with comments suggesting that an attorney could not assist them in piecing together what had happened, or in locating Butler's body—both of which, the troopers asserted, would help Butler's parents deal with their loss.

*Shepherd:* [W]e're trying to figure out what happened so that we can help [Martha Butler's] parents ... get over this, and adjust to it, and ... try to find out ... what actually happened.... [W]e always know [that] there's two sides to the story.... [W]e've been talking to a lot of people, and we've heard what they've been saying, and what you told them. But from our work, we know that there's two sides to the story, and the best place to always hear the story is from the person [who] actually ... was there.

...

*Schied:* [An] attorney can't help us find where Martha is, to help her parents....

[An attorney] is not the one that can help you do that. He's not the one that can help us help [Martha's] parents.

Noyakuk argues that these comments were intended to discourage him from asserting his right to counsel—and that, by making these comments, the troopers violated Noyakuk's rights under *Miranda* and *Edwards*.

In *Giacomazzi v. State*, 633 P.2d 218, 222 (Alaska 1981), our supreme court held that when a suspect in custody makes an ambiguous or equivocal statement about wanting an attorney, the interrogating officers "may seek clarification of the suspect's desires", so long as the officers do not "utilize the guise of clarification as a subterfuge for coerc[ing] or intimidat[ing]" the suspect into waiving this right. Later, in *Hampel v. State*, 706 P.2d 1173, 1180–81 (Alaska App.1985), this Court interpreted *Giacomazzi* as meaning that, in the face of a suspect's ambiguous or equivocal statement about wanting an attorney, the interrogating officers *must* clarify the suspect's wishes, and the officers can not proceed with substantive questioning until they have done so. Moreover, *Hampel* holds that the *Edwards* rule is violated "when an interrogating officer chooses to answer a [suspect's] question [concerning the right to counsel] in a way which the officer knows or should know will be reasonably likely to discourage the accused from asserting the right to counsel." [11]

Noyakuk asserts that the troopers violated *Giacomazzi* and *Hampel* when they made the above-quoted responses to Noyakuk's question about a lawyer.

The State answers that the *Hampel* restriction on custodial interrogations is no longer good law, given the United States Supreme Court's decision in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

The defendant in *Davis*, after receiving *Miranda* warnings, waived his rights and consented to be interviewed. However, about an hour and a half into the interview, the defendant said, "Maybe I should talk to a lawyer." [12] The question presented in *Davis* was whether the defendant's statement obliged the interrogating officers to cease their substantive questioning.

The Supreme Court recognized that many jurisdictions had adopted rules similar to the one announced in *Giacomazzi* and *Hampel:* that is, rules that obliged interrogating officers to cease their substantive questioning and to limit themselves to seeking clarification of the suspect's wishes. [13] However, the Supreme Court declared that federal law did not impose such a restriction:

> [I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.... The *likelihood* that a suspect would wish counsel to be present is not the test for applicability of *Edwards*.
>
> Rather, the suspect must unambiguously request counsel[;] ... he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Davis*, 512 U.S. at 459, 114 S.Ct. at 2355 (emphasis added) (citations omitted).

The Court acknowledged that it was "good police practice" for interrogating officers to seek clarification of a suspect's ambiguous or equivocal statement. However, the Court "decline[d] to adopt a rule requiring officers to ask clarifying questions." Instead, the Court declared: "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning [the suspect]." [14]

The State contends that *Davis* changed the legal landscape and undermined the ra-

---

11. *Hampel*, 706 P.2d at 1181.

12. *Davis*, 512 U.S. at 455, 114 S.Ct. at 2353.

13. *Davis*, 512 U.S. at 456, 114 S.Ct. at 2353–54.

14. *Davis*, 512 U.S. at 461–62, 114 S.Ct. at 2356.

tionale of *Giacomazzi* and *Hampel* (both of which were apparently grounded on federal law). But as the Utah Supreme Court noted in *State v. Leyva*, 951 P.2d 738, 743 (Utah 1997), *Davis* involved an ambiguous or equivocal statement made in the middle of an interview by a suspect who had *already* received *Miranda* warnings and had *already* unambiguously waived his right to counsel. The United States Supreme Court explained its ruling this way:

> [T]he primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves.... A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although *Edwards* provides an additional protection—if a suspect subsequently requests an attorney, questioning must cease—it is one that must be affirmatively invoked by the suspect.

*Davis*, 512 U.S. at 460–61, 114 S.Ct. at 2356.

Thus, the *Davis* rule (that interrogating officers need not interrupt their questioning to clarify the suspect's wishes) applies only to a post-*Miranda*-waiver setting. This view of *Davis* is endorsed by one of the major texts on criminal procedure:

> Although [this] point is sometimes missed, ... *Davis* is so limited; the Court's ruling was that "*after* a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney."

Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* (2nd ed.1999), § 6.9(g), Vol. 2, p. 615 n. 164 (emphasis added) (quoting *Davis*, 512 U.S. at 461, 114 S.Ct. at 2356, and citing Utah's *Leyva* decision in support of this interpretation of *Davis* ).

It may be true, as the State suggests, that the *Giacomazzi* and *Hampel* rule should no longer be applied when a suspect makes an ambiguous or equivocal post-waiver, mid-interview statement about an attorney. We

leave that issue for another day. But the *Davis* decision has not changed the law that applies to cases like Noyakuk's—cases where the question is whether a suspect ever validly waived the right to counsel to begin with.

We now return to the facts of Noyakuk's interrogation.

As we have already explained, when Noyakuk asked, "Shouldn't I just have my attorney with me, or something?", the troopers responded that stopping the interview to allow Noyakuk to obtain an attorney would not help Martha Butler's parents learn what had happened to their daughter and recover her body. On the other hand, the troopers repeatedly told Noyakuk (1) that it was his choice whether to have an attorney present, (2) that if he wanted an attorney, "that [was] fine", and (3) that he needed to make this decision before the troopers proceeded with the interview. After explaining this to Noyakuk, the troopers expressly (and repeatedly) asked Noyakuk whether he was willing to speak to them without an attorney. Three times, Noyakuk stated that he was willing to proceed without an attorney.

These facts are quite a bit different from the facts of *Hampel*—where the interrogating officer responded to Hampel's inquiry about an attorney by "emphasiz[ing] the obstacles to obtaining one", by "focusing on the evidence [against] Hampel", and by strongly implying that Hampel "would damage his case if he delayed talking until an attorney could be present", since the police were just about to interview Hampel's cohorts.[15] It is not surprising that this Court categorized the officer's response as a tactic that was "likely to discourage [Hampel] from asserting the right to counsel".[16]

> [B]y emphasizing ... the delay and bureaucratic complexity of procuring an attorney, while [at the same time] dwelling ... on the evidence against Hampel, the progress of the [police] investigation, and the imminent interrogation of Hampel's companions, [the interrogating officer] created two unmistakable impressions: first, that Hampel was being given an "opportunity" to cooperate, but time was of the

---

**15.** *Hampel,* 706 P.2d at 1181.

**16.** *Id.*

essence; [and] second, that if Hampel elected to request counsel, a substantial delay would inevitably result[,] and he would lose that opportunity. [The officer's] answers ... thus worked more toward persuasion than clarification.

*Hampel,* 706 P.2d at 1182.

The troopers' statements in Noyakuk's case (the statements that an attorney could not help Martha's parents understand what had happened to their daughter or locate her body) might conceivably have worked to dissuade Noyakuk from demanding the immediate presence of counsel, but these statements were not coercive like the ones in *Hampel.* The troopers never stated or implied that Noyakuk's decision to request an attorney's presence would have adverse consequences for Noyakuk personally, or that any delay in the interview process would be unacceptable to the authorities or would hurt Noyakuk in any other fashion. In fact, the troopers told Noyakuk that it would be "fine" if he asked for an attorney.

We conclude that the facts of Noyakuk's case are much closer to the facts presented in *State v. Varie,* 135 Idaho 848, 26 P.3d 31 (2001). The defendant in *Varie* was questioned concerning the disappearance of her husband. When Varie noted during the interview that she did not have a lawyer, the officers asked her if she wanted a lawyer before speaking to them. Varie replied, "[A]m I supposed to have a lawyer?" At this point, the officers explained that it was Varie's choice whether to have a lawyer. The officers told Varie that they did not know if having a lawyer "would make much difference", but that "this was her opportunity to move ahead and tell [the police] what happened." [17] Upon hearing this, Varie began to speak about what had happened. The officers interrupted her to clarify her decision: "[We] guess it is your choice to go ahead and talk with us now without a lawyer?" Varie replied, "[T]hat's fine." [18]

The Idaho court noted that Varie "appeared upset and may have been vulnerable

at the time of the questioning". The court further noted that the officers "[c]learly [engaged in] an effort to de-emphasize the importance of [Varie's] Constitutional rights and [to] stress Varie's opportunity to tell her story". [19] Nevertheless, the court concluded that Varie understood her rights, and that she was not coerced into waiving those rights:

> Significantly, [the officers] broke the subtly persuasive atmosphere of the moment and asked very directly if Varie wished to proceed [with the interview]. She agreed to proceed.

*Varie,* 26 P.3d at 36.

A similar issue was presented in *Mueller v. Angelone,* 181 F.3d 557 (4th Cir.1999). The defendant in *Mueller* was being interrogated (following *Miranda* warnings and a waiver of rights) about a homicide. Midway through the interview, he asked the police officer, "Do you think I need an attorney here?" The officer responded by shaking his head slightly from side to side, moving his arms and hands in a "shrug-like manner", and then telling Mueller, "You're just talking to us." Six minutes later, Mueller began confessing to the murder. [20]

On appeal, Mueller argued that the officer should have ceased all questioning after Mueller inquired about an attorney. Mueller also argued that, even if his question about a lawyer did not require the officer to cease all interrogation, the officer's response to this question was improper, in that it discouraged Mueller from asserting his right to counsel. The court disagreed on both points:

> Mueller can only prevail by showing that[,] under the totality of the circumstances, [the officer's] response made Mueller's continuing waiver [of counsel] the product of other than a free and deliberate choice, or that[,] after [the officer's response,] Mueller no longer understood the nature of the right to an attorney or the consequences of abandoning it.

*Mueller,* 181 F.3d at 575.

The court noted that Mueller was in his forties, and that he had considerable prior

17. *Varie,* 26 P.3d at 34.

18. *Id.*

19. *Id.* at 36.

20. *Mueller,* 181 F.3d at 573–74.

experience with the criminal justice system and the *Miranda* warnings.[21] The court concluded that it was "clear from the record that Mueller, with his extensive experience in such matters, understood both his rights and the consequences of their abandonment. [The officer's] expression of his opinion on the advisability of Mueller's consulting with counsel could not change that understanding." [22]

Like the defendant in *Mueller*, Noyakuk was an adult who had had extensive experience with the criminal justice system. Judge Esch found that, because of Noyakuk's "[prior] experience with both attorneys and the justice system", Noyakuk was well aware of his right to an attorney. As Judge Esch noted, Noyakuk had been convicted several times in the 1980's of minor consuming alcohol, and had been convicted once of disorderly conduct in the 1990's. Moreover, in the year preceding his arrest in April 2001, Noyakuk was convicted three times of domestic assault.

Judge Esch noted that the troopers "explained several times that the decision concerning [an attorney] was up to [Noyakuk]." Judge Esch further noted that the troopers refrained from substantive questioning until Noyakuk indicated his willingness to proceed without an attorney. Based on the exchange between Noyakuk and the troopers, and based on Noyakuk's prior experience with the justice system, Judge Esch concluded that "[i]f [Noyakuk] had wished to speak with an attorney prior to further questioning, he could have done so"—and that, therefore, there was no *Edwards* violation.

We agree with Judge Esch. As we have explained here, the facts of Noyakuk's case are significantly different from the facts of *Hampel*. Noyakuk was not told that it was difficult or impossible to obtain an attorney, nor was he told that a request for an attorney would hurt him or prejudice his case. Rather, he was told that the choice was up to him, and that if he wanted an attorney, "that [was] fine".

Conceivably, Noyakuk might have argued that he was so emotionally distraught over Martha Butler's death, and that he felt so compelled to remedy matters as much as possible with her parents, that the troopers exerted an unconscionable influence on Noyakuk when they commented on the need to help Butler's parents understand what had happened and to recover their daughter's body.

But this was never the focus of Noyakuk's suppression motion, and Judge Esch was never asked to make a finding on the issue of potential emotional overbearing. Rather, Noyakuk argued that it was improper for the troopers to say *anything* to Noyakuk, other than to ask questions that were strictly limited to ascertaining whether Noyakuk wanted an attorney before proceeding with the interview. As we have explained here, the rule is not so strict. The ultimate issue is not what the troopers said, but whether (given what the troopers said) Noyakuk knowingly and voluntarily waived his right to counsel. We agree with Judge Esch that he did.

*Noyakuk's sentence appeal*

■ We have rejected Noyakuk's challenges to the admission of the evidence against him. Accordingly, we affirm his conviction for murder. We now turn to the remaining issue in this case: Noyakuk's appeal of his sentence.

Noyakuk was convicted of first-degree murder—intentionally killing another human being. This offense is an unclassified felony with a mandatory minimum sentence of 20 years' imprisonment and a maximum sentence of 99 years' imprisonment.[23] Judge Esch sentenced Noyakuk to 99 years with 24 years suspended—*i.e.*, 75 years to serve.

■ Noyakuk argues that his conduct was more akin to second-degree murder (*i.e.*, an unintended homicide committed under circumstances where there is great risk of death). Thus, Noyakuk contends that he should have received a sentence more in line with the 20– to 30–year benchmark range

21. *Id.*

22. *Id.*

23. AS 11.41.100(b); AS 12.55.125(a).

that this Court has established for first felony offenders convicted of second-degree murder.[24]

In arguing that his conduct was similar to a second-degree murder, Noyakuk points out that the killing was not premeditated, that he did not kill his victim merely for the thrill of it, and that he did not torture or engage in deliberate cruelty toward his victim. But all of these are factors that *aggravate* a first-degree murder. That is, if one or more of these factors had been present, this would have shown that Noyakuk's crime was *more* serious than the typical first-degree murder.[25] It does not follow that the absence of these factors establishes that Noyakuk's crime was *less* serious than a typical first-degree murder.

Noyakuk's act of murdering Martha Butler was a crime of domestic violence, since Noyakuk and Butler shared a household.[26] Judge Esch found that Noyakuk had a history of repeated assaultive conduct, including two prior assaults against Butler. In addition, Judge Esch noted that Noyakuk engaged in a "significant and protracted" effort to conceal the murder and to avoid apprehension.

Judge Esch could reasonably conclude that these factors called for a sentence within the upper range of the penalties for first-degree murder.

(Compare *Sakeagak v. State*, 952 P.2d 278, 285 (Alaska App.1998), where we held that a defendant challenging the reasonableness of a 99-year sentence for first-degree murder was obliged to show some reason to believe that their offense was mitigated or that their background was atypically favorable.)

After independently reviewing the record in Noyakuk's case, we conclude that Judge Esch was not clearly mistaken when he sentenced Noyakuk to serve 75 years in prison.[27]

*Conclusion*

The judgement of the superior court is AFFIRMED.

**24.** See *Page v. State*, 657 P.2d 850, 855 (Alaska App.1983).

**25.** See *Hamilton v. State*, 59 P.3d 760, 772 (Alaska App.2002):

We have repeatedly held that premeditated murder is among the most serious conduct within Alaska's definition of first-degree murder—and that, in first-degree murder cases, a defendant's premeditation, standing alone, will support a sentence of 99 years' imprisonment. Moreover, even in cases of second-degree murder (*i.e.*, cases in which the killing was unintended), we have repeatedly upheld sentences in the upper end of the penalty range for

defendants who committed gratuitous or otherwise inexplicable acts of extreme violence.
And see *Harmon v. State*, 908 P.2d 434, 444 (Alaska App.1995) (holding that a first-degree murder is aggravated when the defendant tortures or inflicts gratuitous pain on the victim).

**26.** Compare AS 12.55.155(c)(18)(A), which provides that crimes against household members are aggravated for purposes of presumptive sentencing.

**27.** See *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).