**Roger H. HAMPEL, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. 7398.

Court of Appeals of Alaska.

Sept. 27, 1985.

Grant Callow and Linda Wilson, Asst. Public Defenders, and Dana Fabe, Public Defender, Anchorage, for appellant.

Charles W. Merriner and John Scukanec, Asst. Attys. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Roger H. Hampel was convicted, after a jury trial, of murder in the first degree.

AS 11.41.100(a)(1). Certain incriminating statements made by Hampel to police officers were admitted into evidence at trial. On appeal, Hampel contends that the statements were obtained in violation of his constitutional right to have counsel present during custodial interrogation. We reverse.

## FACTS

The body of James Music was discovered in a rural area north of Sutton on January 4, 1982. Music had been shot three times. The next day, operating on an informant's tip, Alaska State Troopers began surveillance of a Government Hill apartment which Music shared with Roger Hampel, Tracey "Charlie" Beard, and a sixteen-year-old girl named Lisa Moshier.

Around 7:00 p.m. on January 5, 1982, two troopers stopped Roger Hampel as he was driving out of the parking area behind his apartment building. The troopers' vehicle blocked the path of Hampel's car. With guns drawn, the troopers asked Hampel to exit his vehicle. Hampel was subjected to a pat-down search and placed in the troopers' vehicle while they waited for an investigator, Sergeant Flothe, to arrive. Hampel was not told that he was free to leave.

Sergeant Flothe told Hampel that his vehicle was possibly involved in a homicide and that the police wanted to talk to Hampel down at the State Trooper's headquarters. Hampel was told that he was not under arrest. He was removed to Flothe's vehicle and transported to trooper headquarters, where he was advised of his rights a second time and again told that he was not under arrest. At trooper headquarters, Hampel was questioned for three hours by Sergeant Flothe and Lieutenant Lucking, also of the Alaska State Troopers. Hampel was escorted by a trooper during breaks in the questioning. He was never told that he was free to leave.

After almost an hour and a half of questioning Hampel about the car and his apartment-mates, Lucking informed Hampel, "Okay now, your buddy's dead. He's dead.

I don't have no question about, and that's what we're investigating. Not the car without the proper title and stuff ..." Shortly thereafter the questioning focused on Hampel as the primary suspect in the homicide investigation. Lucking told Hampel, "I think probably your gun or things were used. And there's a lot of evidence pointing to you, you know." In response, Hampel asked about obtaining an attorney:

H[ampel]: I've got one question.

L[ucking]: Um-hum. Sure.

H: Um, and the question is concerning a lawyer.

L: Concerning what?

H: A lawyer.

L: Uhhuh.

H: Okay, uh, first of all how would I be able to get one, a lawyer?

L: Okay. You were read your rights, okay, and you're certainly entitled to a lawyer, if you cannot afford one the State'll buy one. This hour of the evening I'm not sure, it probably ... probably have to call the court and find out. I mean I ... the court ... it's a whole lot of rigmarole.

Lucking then informed Hampel of his right to stop the questioning, while at the same time elaborating on the difficulties that a request for an attorney would present:

L: Okay? If you want a lawyer and you want to stop now we have to stop now and we're gonna have to go on with other things which includes talking to

Charlie and everybody else until such time that you can get a lawyer and that's probably gonna be in the daytime when you can go before the court and swear to the court that you're an indigent, that is that you're poor, you don't have the money to buy a lawyer, okay, you're a pauper ... take a pauper's [oath] and the court questions to you, you know, whether or not you can afford one and if the court decides that you can't afford a lawyer, you don't have any assets, no income, nobody to help you out then they can appoint (inaudible) to represent you. And if you're stuck there you can go to the public defenders office, somebody assigned from the public defender will get together with you and proceed to (inaudible).

Hampel interrupted to ask a question about the delay in getting an appointed lawyer:

H: What if one of it ... one ... uh one of us is found guilty what happens then and where will they be put and etcetera till the time that they get hold of a lawyer.

Lucking answered with a lengthy explanation of the criminal justice system and, without pausing for clarification of Hampel's intent with respect to counsel, Lucking proceeded with an elaboration of the evidence against Hampel, emphasizing that, "It's your opportunity to tell us all about it." [1] Hampel subsequently admitted

---

1. Lucking stated, in relevant part:
   I don't have any crystal balls, I really don't and (inaudible) honestly, I'm being as honest as I can, I don't know. If a person gets convicted, like I said there's always certain circumstances and that certainly is a consideration in sentencing or even in the particular charge, there's various of ... of homicide okay. Uh, one, two, three, four, five, however many there are and ... that's somewhat of the investigations that we do, it depends on ... on ... on a level of the charge, what ... why it happened determines the level of the charge and the motive type thing, uh, and the person has to be found guilty before he can be sentenced and there's a lot of things taken into consideration at sentencing. The person's past criminal history, and their position

in society and ... and where they're gonna go from that point and then as far ... is a person spends time in jail it depends on the timing. If it's a short time, you know, people stay right here locally, Eagle River or down town jail but if it's a long time they may be shipped to another state institution, okay. And then there's other things that happen to, if a person found guilty or whatever (inaudible). It's just a very long process, so there's no simple answer and I don't know, I don't have any input as to how long a person gets sentenced, I don't have any input as to where they serve their sentence or that or anything else. There is a whole lot of people that make up the wheel of justice if you would, we're just one little cog in the wheel that turns the whole thing, there's ... there's a public defender and

shooting Music, prefacing his remarks by stating, "... I'm not sure if I should even

a prosecutor, the judges, the cops, um, the probation officer that help people in time, you know, so. I can't answer your question, uh, I don't know. We're investigating the death like I said and ... and frankly that's the straw to me that the gun's over there in the car after you told me it was stolen, okay. And you said that we packed and we loaded up the car and you told me the car wasn't up in that area and you're saying you've never passed Eagle River. And I don't know and I'm telling types and generally the same size boots. Got to send that off to experts to say whether or not those are the boots that made the tracks and you're saying you've never been there and you're wearing the boots that were there, I assume maybe your foot was in the boot. And we have other things too that I can't share with you, I can't tell you everything. I'm trying to give you as much information as I can so that you can make an intelligent decision as to what you have to do. There's a lot of evidence against you. A lot of evidence against you and what I'm trying to stop now is probably be tomorrow and subsequent the wheel in motion and it's time and that's okay. That's what you want, we do have to talk to your friend. My information is that only one person went up there, that some of you went up there, or all of you went up there. I think the three of you went up there. I'm not sure who the girl was whether it was your girlfriend or whether it was Charlie's girlfriend. Charlie didn't go out in the woods where the body was. Maybe he dumped the guy on the road, it was a long way to pack a body and I've dragged a few bodies and I know.

. . . .

So I mean things can't see things you can appreciate that. When we talk to Charlie about the same thing that we're talking to you and to your girlfriend. I want her to tell me. Yeah I took him home, dropped him off at the apartment. You're not gonna talk to her between now and then because she's being rustled with right now. Everything that everybody says better fit with what you're saying. Before there's further problems. I don't know if Charlie's ready to take a dive for murder to try to cover your ass assuming he didn't do it, or the girl, the sixteen year old girl. Or your girlfriend or Ralph with the Timesaver or Joe. So it's your decision.

H: I guess ...

L: What I'm saying is it doesn't look good for you. Frankly I'm pretty satisfied as to what happened, I don't know why but it's your opportunity to tell us all about it. And the same opportunity has been presented to Charlie and all the other people. And all the stories better jive. That's where we're at. Different levels, no charges for this type of offense. Motive is the biggest consideration

say anything right now or not but I'll go ahead anyway."

for identifying which it's gonna be. And there's the trial and that's a legal process and assuming that a person's found guilty on a particular charge there's a presentence report, the probation people look into the person's background to see what they had been up to and where they might be going in their life and are they subject to rehabilitation and if so how ... how can the system do to help the person and then it's a matter of coming to time and then serve (inaudible) ... and then it's part of where you serve the time for this. I don't know that either, (inaudible) figure that out, sitting at the time of sentencing or prior to sentencing, there's a presentencing hearing I think where your attorney has an opportunity provide some input as to what the attorney might best contribute to rehabilitating the person. So ... right now we're the cops, we're investigating the guys who's dead, died of gunshot wounds, plus evidence, some of which I've pointed out to you says you did it (inaudible). Now at the moment maybe one of your other friends did. I don't think the girl went out there by the foot tracks and all the other stuff we have out there. It was your gun that was used, there's no question in my mind about that, the guns in the car you're driving. I don't see anything that says Charlie out by up there in question. You get my drift about the evidence, I could go on but ... but I choose not to know. I don't want to tell all. It's time for you to make a decision. You can mull about for a minute or two that's okay. I mean I'd give anything for ... the other two are being brought over right now, should be here in a little bit. I'm gonna talk to them individually at the same thing; it better all fit. Their gonna be asked to make a decision just like you are. Came in we got to go to your girlfriend down at Moby Dicks that's why I need to find at where she's at (inaudible). We are professional people I like to think on that, find people at a time (inaudible). What happened, what were the extenuating circumstances and what the hell has been going on that's my question. I can't make any promises, I'm certainly not going threaten you or abuse, you can use a can if you have to take a whiz break, or get a coffee, or whatever. You can tell we've been doing a lot of small talk waiting for the search warrant gets here. You can bet money the gun was in there. I don't know what else we're gonna find there, the ammo's over there, you can see it was stolen (inaudible). I don't know what's going on at department, cause I don't ... as you know I don't have contact with the defense.

H: I'll tell you this much, I'm not sure if I should even say anything right now or not but I'll go ahead (inaudible)....

Prior to trial, Hampel moved to suppress his statement on the grounds that the troopers continued to interrogate him after he had requested counsel, in violation of his constitutional rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

Superior Court Judge Ralph Moody denied Hampel's motion, after a hearing, finding:

> The situation is, he indicated that it might be helpful if I had an attorney, but he says I've—I might want an attorney, but I've thought it over and I'm going ahead and talk without an attorney. He specifically considered getting one and decided he didn't want one and proceeded without it.

## CUSTODIAL INTERROGATION

■ Hampel argues on appeal that the admission into evidence of his incriminating statements of January 5, 1982, violated his constitutional rights against self-incrimination and to assistance of counsel. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court established procedural safeguards to reduce the coercive impact "inherent in custodial surroundings." The Court said that the right to have counsel present at an interrogation is indispensable to the protection of the fifth amendment privilege against self-incrimination, 384 U.S. at 469, 86 S.Ct. at 1625, 16 L.Ed.2d at 721, and held that an accused could invoke his right to have counsel present by indicating "in any manner and at any stage of the process" that he desired to consult with an attorney. 384 U.S.

at 473–74, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723.

In *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386 (1981), the Supreme Court ascribed *per se* effect to the *Miranda* safeguards:[2]

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [A]n accused ... having expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused initiates further communication, exchanges, or conversations with the police.

The state argues initially that the *Edwards* rule is inapplicable to this case because Hampel was not in custody during his interview with Troopers Lucking and Flothe. *Miranda* requires that a suspect be informed of his fifth and sixth amendment rights only before "custodial interrogation." "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. The proper standard for determining custody is whether "a reasonable person would feel he was not free to leave and break off police questioning." *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979).

The record here compels a finding that Hampel was in custody at the time he made his incriminating statements.[3] Even though Hampel was told that he was not formally under arrest, a reasonable person

---

2. The Court has repeatedly emphasized this "rigid prophylactic rule" as a restraint on police interrogation. *Smith v. Illinois*, 469 U.S. ——, ——, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488, 493 (1984). *See also Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405, 411 (1983); *Fare v. Michael C.*, 442 U.S. 707,

719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197, 208 (1979).

3. The trial court did not rule on the threshold question of whether Hampel was in custody, finding only that he voluntarily proceeded to answer questions without an attorney present.

in his situation would not have felt free to leave. Initially, Hampel's car was blocked by a trooper vehicle. Hampel was stopped and searched by two troopers with their guns drawn. Four troopers and three trooper vehicles were soon on the scene. Hampel was escorted to trooper headquarters. At the station, Hampel was questioned for three hours as a suspect in a homicide investigation. A trooper was with him at all times, including trips to the restroom and for coffee; he was never told that he was free to leave and was twice informed of his *Miranda* rights. All of the relevant factors set out in *Hunter* support a finding that Hampel was subjected to "custodial interrogation" within the meaning of *Miranda*. *See Hunter*, 590 P.2d at 895. *See also State v. Cassell*, 602 P.2d 410, 414–15 (Alaska 1979). *Cf. Hayes v. Florida*, 470 U.S. ——, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

## VOLUNTARY WAIVER

■ "An accused in custody, 'having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him,' unless he validly waives his earlier request for the assistance of counsel." *Smith v. Illinois*, 469 U.S. ——, ——, 105 S.Ct. 490, 492, 83 L.Ed.2d 488, 493 (1984), *quoting*

*Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, 386 (1981). In applying this rule, a court must first determine whether the accused invoked his right to have an attorney present at the interrogation. *Giacomazzi v. State*, 633 P.2d 218, 221 (Alaska 1981). "[I]t is plain that 'a suspect may indicate that he wishes to invoke the privilege by means other than an express statement to that effect; no particular form of words or conduct is necessary.'" *Id., quoting People v. Randall*, 1 Cal.3d 948, 83 Cal.Rptr. 658, 662, 464 P.2d 114, 118 (1970).[4]

■ Hampel interrupted police questioning to ask a question concerning a lawyer. He did not unambiguously request that the interrogation cease until he could consult a lawyer. Instead he asked, "[F]irst of all how would I be able to get one, a lawyer?" The trial court found that while Hampel "specifically considered getting one" he decided to proceed without a lawyer present.[5]

■ As the Supreme Court noted in its recent *per curiam* opinion in *Smith v. Illinois*, 469 U.S. ——, ——, 105 S.Ct. 490, 493, 83 L.Ed.2d 488, 494 (1984), courts have developed conflicting standards for determining the consequences of an accused's ambiguous or equivocal request for counsel. Cases generally divide into two approaches. Some courts, interpreting literally the language in *Miranda* that the

---

**4.** Alaska appellate courts have held that a police officer may continue questioning when faced with an ambiguous or equivocal assertion by the accused of his constitutional right to remain silent. *Vail v. State*, 599 P.2d 1371, 1378–79 (Alaska 1979); *Nashoalook v. State*, 663 P.2d 975, 978 (Alaska App.1983); *Pierce v. State*, 627 P.2d 211, 217 n. 7 (Alaska App.1981). However, the right to counsel is more rigidly observed than the right to silence. *See Giacomazzi*, 633 P.2d at 221 n. 2. *Compare Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (questioning must cease after invocation of right to counsel) *with Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (accused's invocation of right to silence must be "scrupulously honored"). *See also Giacomazzi* at 226 (Rabinowitz, C.J., dissenting) ("essential that the police and courts be more sensitive to what may be a fairly tentative or timid inquiry

concerning access to counsel than in the situation of one invoking the right to silence").

**5.** The trial court's finding distinguishes this case from *Giacomazzi*, where the Alaska Supreme Court read the superior court's opinion as a factual finding that Giacomazzi did not even contemplate invoking his right to have counsel present during interrogation. 633 P.2d at 223. The trial court's findings of fact will be upheld unless clearly erroneous. *Troyer v. State*, 614 P.2d 313, 318 (Alaska 1980). In the present case, the trial court apparently found that Hampel waived his right to have counsel present during questioning. As to the qeustion of whether a knowing and intelligent waiver should be found, "we have a duty to examine the entire record and make an independent determination." *Giacomazzi* at 222, *quoting Troyer* at 318.

right to counsel may be invoked "in any manner," have held that all questioning must cease upon any reference to counsel, however ambiguous or equivocal. *See, e.g., People v. Superior Court,* 15 Cal.3d 729, 125 Cal.Rptr. 798, 802–03 542 P.2d 1390, 1394–95 (1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976); *Singleton v. State,* 344 So.2d 911 (Fla.Dist.Ct. App.1977); *State v. Ayers,* 16 Or.App. 300, 518 P.2d 190, *cert. denied,* 419 U.S. 1093, 95 S.Ct. 687, 426 L.Ed.2d 686 (1974). The second approach is to permit a limited inquiry for the purpose of clarification after an accused makes a statement that arguably might be construed as a request for counsel.[6] *See, e.g., United States v. Cherry,* 733 F.2d 1124 (5th Cir.1984); *Thompson v. Wainwright,* 601 F.2d 768 (5th Cir. 1979); *United States v. Riggs,* 537 F.2d 1219 (4th Cir.1976); *United States v. Prestigiacomo,* 504 F.Supp. 681 (E.D.N.Y.1981); *State v. Moulds,* 105 Idaho 880, 673 P.2d 1074 (App.1979); *Daniel v. State,* 644 P.2d 172 (Wyo.1982).

In *Giacomazzi v. State,* 633 P.2d 218, 222 (Alaska 1981), the Alaska Supreme Court implicitly rejected the first approach, while approving of the second. In noting the difficulty for a police officer in determining whether a suspect indeed intends to invoke his right to have an attorney present, the court stated: "For this reason, the officer may seek clarification of the suspect's desires." Permitting clarification of an accused's request is necessary to protect his rights without unduly interfering with reasonable police questioning. *State v. Moulds,* 105 Idaho 880, 673 P.2d 1074, 1082 (App.1979). This approach avoids the rigid rule of prohibiting further questioning upon any vague reference to an attorney, while providing police and the courts with a standard which protects the rights of those who desire the presence of counsel at questioning but whose requests fail to meet an arbitrary threshold of clarity.

■ We therefore follow the second, more pragmatic, approach. In keeping with *Giacomazzi,* we hold that when the accused makes an ambiguous or equivocal reference to counsel during a custodial interrogation, the officer need not immediately terminate the interrogation. Further questioning, however, must be limited to clarifying the reference. Thus, any questioning on the subject matter of the investigation must be suspended until the intent of the accused is clarified. This point was clearly stated by the Fifth Circuit Court of Appeals in *Thompson v. Wainwright,* 601 F.2d 768, 771–72 (5th Cir.1979):

> Whenever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it is clarified. When and if it is clarified as a present desire for the assistance of legal counsel, *all* interrogation must cease until that is provided, just as in the case of an initial, unambiguous request for an attorney. And no statement taken after that request is made and before it is clarified as an effective waiver of the present assistance of counsel can clear the *Miranda* bar. [Emphasis in original.]

■ If no reasonable effort were made to clarify equivocal requests for counsel during custodial interrogations, only those who are most assertive and articulate would be capable of effectively exercising their fifth amendment rights. Little would remain of *Miranda*'s declaration that the right to counsel may be invoked "in any manner." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 707 (1966). Unless the intent of the accused is appropriately clarified after an equivocal or ambiguous reference to counsel, the voluntariness of any subsequent

---

**6.** A few courts have embarked on yet a third approach, attempting to define a threshold standard of clarity before a request will trigger the right to counsel. *See, e.g., People v. Krueger,* 82 Ill.2d 305, 45 Ill.Dec. 186, 412 N.E.2d 537, 540, *cert. denied,* 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 390 (1980).

statements given in response to continued custodial interrogation is necessarily subject to grave doubt.

In the present case, it is clear that the interrogating troopers did not seek merely to clarify Hampel's requests about obtaining an attorney before pressing on with the interrogation. After informing Hampel of his right to an attorney, Lieutenant Lucking proceeded to emphasize the obstacles to obtaining one. Lucking then expounded at length on the complexities of the criminal justice system, ultimately focusing on the evidence incriminating to Hampel. He told Hampel that the gun had been found in the car he was driving and that his boots matched tracks found near Music's body. Lucking's talk was purportedly intended to assist Hampel in deciding whether to exercise his fifth amendment rights:

> Lucking: ... I'm trying to give you as much information as I can so that you can make an intelligent decision as to what you have to do. There's a lot of evidence against you. A lot of evidence against you and what I'm trying to stop now is probably be tomorrow and subsequent and it's time and that's okay.

But the obvious effect of the discourse was to emphasize that Hampel would damage his case if he delayed talking until an attorney could be present. Lucking further told Hampel that an attorney probably could not be obtained until the next day and his friends were being interviewed that night:

> Lucking: ... You're not gonna talk to her [Hampel's girlfriend] between now and then because she's being rustled with right now. Everything that everybody says better fit with what you're saying. Before there's further problems.... *What I'm saying is it doesn't look good for you.* Frankly I'm pretty satisfied as to what happened, I don't know why but it's your opportunity to tell us all about it. And the same opportunity has been presented to Charlie and

all the other people. And all the stories better jive. that's where we're at.... *You get my drift about the evidence.... It's time for you to make a decision ... the other two are being brought over right now ...* I'm gonna talk to them individually at the same thing; it better all fit.... *What happened, what were the extenuating circumstances and what the hell has been going on that's my question.* [Emphasis added.]

We recognize that Lucking's statements were made in response to direct questions posed by Hampel, and we think it appropriate to emphasize that nothing in this opinion is intended to suggest that the police should feel constrained in responding to questions posed by the accused in the course of an interrogation. We further emphasize that, where the accused asks a question that contains an ambiguous or equivocal reference to the availability of counsel, an interrogating officer must be given considerable latitude in formulating a reasonable and responsive answer; in gauging the reasonableness of a specific answer, due regard must be given to the pressures under which it was formulated, and full account must be taken of the understandable limitations on the scope of legal expertise that can reasonably be expected under the circumstances.

Nevertheless, the need to avoid any undue influence or coercive effect on the accused's right to request the presence of counsel during an interrogation makes it imperative that certain limits be placed on the manner in which ambiguous or equivocal questions concerning the availability of counsel may be answered. We believe those limits are exceeded when an interrogating officer chooses to answer a question in a way which the officer knows or should know will be reasonably likely to discourage the accused from asserting the right to counsel.[7]

---

7. We emphasize that the standard we adopt is an objective one, and does not depend on the subjective intent of the interrogating officer.

*Cf. Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), *cert. denied,* 456 U.S. 930, 102 S.Ct. 1980, 72 L.Ed.2d 447 (1982)

We find support for our conclusion under both state and federal caselaw. In *Giacomazzi v. State*, 633 P.2d 218 (Alaska 1981), after stating that an officer may seek clarification of a suspect's desires, the Alaska Supreme Court added: "This is not to say that an interrogating officer may utilize the guise of clarification as a subterfuge for coercion or intimidation." *Id.* at 222, *quoting Nash v. Estelle*, 597 F.2d 513, 517–18 (5th Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). Similarly, the United States Court of Appeals for the Fifth Circuit reversed a conviction in *Thompson v. Wainwright*, 601 F.2d 768 (5th Cir.1979), where, after an equivocal request for counsel, the interrogator's inquiry was not limited to clarifying the request but included speculative statements about the advice the accused was likely to receive from an attorney, the effect of which was to persuade the suspect to tell his side of the story.

In the present case, Hampel's two questions about obtaining an attorney—though they did not constitute unambiguous or unequivocal requests—plainly indicated the possibility that Hampel desired the presence and assistance of counsel. In answering these questions, Lieutenant Lucking did not seek to clarify whether Hampel was attempting, in a tentative manner, to exercise his right to counsel or whether he was simply asking for factual information. Lucking's answers assumed that Hampel only wanted information. Nor were his answers given in a neutral manner—one which would not be reasonably likely to affect Hampel's decision. Rather, by emphasizing, on the one hand, the delay and bureaucratic complexity of procuring an attorney, while dwelling, on the other hand, on the evidence against Hampel, the progress of the investigation and the imminent interrogation of Hampel's companions, Lieutenant Lucking's responses to Hampel's questions created two unmistakable impressions: first, that Hampel was being given an "opportunity" to cooperate, but time was of the essence; second, that if Hampel elected to request counsel, a substantial delay would inevitably result and he would lose that opportunity. These answers to Hampel's questions about obtaining counsel thus worked more toward persuasion than clarification.

The unmistakable element of persuasion in Lieutenant Lucking's answers was fundamentally incompatible with the need to refrain from further interrogation until Hampel's ambiguous requests were clarified. Under these circumstances, we are unable to conclude that the state has met its "heavy burden" of showing that Hampel made a knowing and intelligent waiver of his right to have counsel present during questioning. Our independent review of the record persuades us that the trial court's finding of a voluntary *Miranda* waiver was in error. *Giacomazzi*, 633 P.2d at 222; *Troyer v. State*, 614 P.2d 313, 318 (Alaska 1980).[8]

The conviction is REVERSED.

---

(adopting an analogous standard for determining whether "interrogation" has occurred). It is therefore unnecessary to determine whether, in this case, Lieutenant Lucking actually intended to discourage Hampel from requesting an attorney, and we express no view on the question. We further believe it important to draw a distinction between the manner in which an interrogating officer chooses to formulate a response and the substance of the response itself. Nothing in our opinion is intended to suggest that an interrogating officer would commit any impropriety or otherwise be precluded from answering a question by the accused directly calling for a response containing substantive information likely to discourage exercise of the right to counsel. We deal in this case only with the manner in which a response is articulated and, to that extent, with substantive information included in the response which is not directly called for by the accused's questions. We believe it clear from the record that, in this case, Hampel's questions did not reasonably call for a speculative elaboration of the potential difficulties that might be faced in attempting to obtain counsel; nor do the questions seek to elicit a detailed review dealing with the timing and progress of the investigation.

**8.** Hampel has raised two additional arguments on appeal; first, he claims the trial court erred in refusing to dismiss the case because the state destroyed potentially exculpatory evidence. We find this claim to be without merit and reject it. *See Williams v. State*, 629 P.2d 54, 64 n. 21 (Alaska 1981). Second, Hampel contends that

the 99-year sentence imposed below is excessive. Our disposition of Hampel's *Miranda* argument renders it unnecessary to decide the sentencing issue at this time.