NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

STEVEN RIDENOUR,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13282
Trial Court No. 3KO-16-00012 CR

O P I N I O N

No. 2766 — November 24, 2023

Appeal from the Superior Court, Third Judicial District, Kodiak, Steve W. Cole, Judge.

Appearances: Renee McFarland, Deputy Public Defender, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge ALLARD.

Steven Ridenour was convicted of first-degree murder and tampering with evidence after he shot and killed his co-worker, Steven McCaulley, on a remote island north of Kodiak.[1]

On appeal, Ridenour argues that the superior court erred when it denied his motion to suppress statements he made during his first interrogation by Alaska State Troopers. During the interrogation, and after Ridenour had been read his *Miranda* rights, Ridenour asked whether he should proceed without an attorney. Instead of clarifying whether Ridenour was asking for an attorney, the troopers dissuaded him from seeking representation and suggested that evidence critical to his defense would never be found if he requested an attorney. For the reasons explained in this decision, we conclude that the troopers' conduct violated Ridenour's privilege against self-incrimination guaranteed by Article I, Section 9 of the Alaska Constitution, and we therefore reverse Ridenour's convictions.

Ridenour also challenges the superior court's denial of his motion to suppress evidence obtained following the execution of a search warrant of the home he was staying in. Because this issue will likely arise again on remand, we explain why we conclude that a portion of the court's order was incorrect. But we express no opinion on whether this ultimately requires suppression of the evidence found during the execution of the search warrant. The parties may continue to litigate these issues on remand.

Lastly, Ridenour challenges the superior court's denial of two motions for a new trial Ridenour filed after he was convicted. Because we conclude that Ridenour is already entitled to a new trial, we do not address those arguments.

---

[1]    AS 11.41.100(a)(1)(A) and AS 11.56.610(a)(1), respectively.

*The underlying incident*

In July or August of 2015, Joe Krall hired Steven Ridenour as a caretaker of the Port William Lodge on Shuyak Island near Kodiak. Approximately three weeks later, Krall hired Steven McCaulley to help with woodworking. On November 17, 2015, one of Ridenour's brothers called Krall and told him that McCaulley may have been shot.

In response to the phone call from Ridenour's brother, Krall (who lived near Anchorage) called the Alaska State Troopers in Kodiak and asked them to check on McCaulley. Krall also traveled to Kodiak himself. When the troopers arrived on Shuyak Island, they found McCaulley's body on the ground near one of the lodge's bunkhouses. McCaulley had been shot eleven times by a rifle and a shotgun. Ridenour was no longer on the island.

Back in Anchorage, troopers were able to identify a trailer home that Ridenour had listed as his residence. The home was also listed as the residence for Rebecca Kragero. According to Ridenour, he and Kragero were not married but were in a long-term domestic relationship and had two children together. Troopers obtained a search warrant for the residence and seized two cell phones, one belonging to Ridenour and the other to Kragero. (We describe the execution of the search warrant in more detail later in this decision.)

Ridenour had outstanding misdemeanor warrants that were unrelated to McCaulley's death, and troopers arrested Ridenour pursuant to these warrants in the early morning hours of November 19, 2015. Investigators David DeCoeur and Ramin Dunford interrogated Ridenour at the jail shortly after his arrest. The interview began at 1:40 a.m. and lasted approximately two and a half hours.

After settling into the room, Dunford closed the door and asked Ridenour to take a seat. Ridenour was handcuffed. Dunford read Ridenour his *Miranda* rights,[2] and Ridenour affirmed that he understood his rights and would talk to the troopers.

Ridenour quickly admitted to shooting McCaulley, but asserted that he acted in self-defense. He told the troopers that McCaulley "just [went] crazy," threw a wedge (a tool used for cutting down trees) at him, and then came after him with a chainsaw.

After admitting that he shot McCaulley, Ridenour asked whether he should keep talking without an attorney:

> *Ridenour*: So he pulls out of the tree and he starts fucking screaming and hollering. And, uh, well he comes at me with the chainsaw. I come over here. He just turns [and] come[s] out here with the chainsaw. So . . . should I do this without an attorney?
>
> *Dunford*: What's that?
>
> *Ridenour*: Should I do this without an attorney?
>
> *Dunford*: Oh —
>
> *Ridenour*: Am I hanging myself here?
>
> *Dunford*: We can't advise you one way or the other what you can or should or shouldn't do legally. Uh, we talked to you before. You don't have to talk to us if you don't want to. You, you can, you can stop at any time. I mean the door's closed for privacy and we're here talking but, but.
>
> *Ridenour*: Privacy don't matter. I, mean I, I don't have nothing to hide but I just want to, you know, this don't look good. It ain't going to look good.
>
> *Dunford*: Well.
>
> *Ridenour*: It wasn't pretty.
>
> *Dunford*: Well you're the only one that can decide that. I mean, you're the only one that knows right now. I

---

2    *See Miranda v. Arizona*, 384 U.S. 436 (1966).

mean, all we'll have when we [get] out [there] is what we see on the scene. And if we don't get from you what happened we won't know where to look for what. You know, if you tell us you use the shotgun over here we need to know that so we can go over here and look for shotgun shells.

After this exchange, Ridenour said, "Everything that happened was self-defense except I went overboard." He later explained that he went "overboard" by shooting McCaulley again because "he was suffering." Ridenour then proceeded to describe the events in further detail for the troopers.

Troopers conducted a second interview at the jail on December 21, 2015. At the time, Ridenour was serving a misdemeanor sentence related to his outstanding arrest warrants and was to be released on January 13, 2016. The interview was conducted by Investigator DeCoeur, who was present at the first interview, and Investigator Dennis Dupras, who was not. Ridenour was in handcuffs during the interview.

After some small talk, Investigator Dupras said they had some more questions for Ridenour and needed him to "fill in some blanks." At this point, Ridenour asked if he should get a lawyer. The troopers told Ridenour that they were not attorneys and that he would need to decide for himself whether to speak with them. Ridenour responded, "I don't mind talking I mean, but, I mean I can stop any time right?" The troopers responded that he could, and also told him that he could refuse to answer individual questions. Ridenour ultimately agreed to speak with the troopers, and the interview lasted approximately one hour.

In January 2016, Ridenour was indicted on multiple felony charges related to McCaulley's death, including first-degree murder. Prior to trial, Ridenour's attorney moved to suppress the statements Ridenour made during the November and December interviews on state and federal constitutional grounds. With respect to the November interview, Ridenour argued that he made an ambiguous or equivocal request for counsel and that Investigator Dunford both failed to clarify if Ridenour was seeking an attorney

and attempted to dissuade Ridenour from requesting one. With respect to the December interview, Ridenour argued that he was not re-*Mirandized* at the beginning of the interview, and that his statements were the product of the earlier violation by the troopers at the November interview. The superior court held an evidentiary hearing and took testimony from Investigators DeCoeur and Dunford. The superior court ultimately denied Ridenour's motion.

Ridenour was convicted at trial of first-degree murder and tampering with evidence. This appeal followed.

*Why we conclude that Ridenour's post-invocation statements during the November interview should have been suppressed under Article I, Section 9 of the Alaska Constitution*

On appeal, Ridenour renews his argument that the troopers failed to clarify his request for counsel and actively discouraged him from invoking his right to counsel after he asked, "Should I do this without an attorney?" As we are about to explain, the troopers' conduct in this case did not violate the federal constitution under existing United States Supreme Court precedent, but we nonetheless conclude that it violated the Alaska Constitution.

In *Edwards v. Arizona*, the Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."[3] The Court continued, "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel

---

[3] *Edwards v. Arizona*, 451 U.S. 477, 484 (1981).

has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."[4]

Under *Edwards*, it is clear that police must immediately cease questioning after a defendant has "invoked his right to have counsel present." But "[i]t may be difficult for a police officer to determine whether a suspect indeed intends to invoke his right to have an attorney present."[5] This possibility created a problem that was not addressed in *Edwards* itself: what are police officers required to do when a suspect in custody makes an ambiguous or equivocal statement about wanting an attorney?

After *Edwards* was decided, courts developed at least three different approaches to this problem. Some held that "all questioning must cease upon any request for or reference to counsel, however equivocal or ambiguous."[6] A second group "attempted to define a threshold standard of clarity for such requests, and . . . held that requests falling below this threshold do not trigger the right to counsel."[7] And a third group — the majority of courts — held that "when an accused makes an equivocal statement that 'arguably' can be construed as a request for counsel, all interrogation must immediately cease except for narrow questions designed to 'clarify' the earlier statement and the accused's desires respecting counsel."[8]

---

[4] *Id.* at 484-85.

[5] *Giacomazzi v. State*, 633 P.2d 218, 222 (Alaska 1981).

[6] *Smith v. Illinois*, 469 U.S. 91, 96 n.3 (1984) (citing *People v. Superior Court*, 542 P.2d 1390, 1394-95 (Cal. 1975) and *Ochoa v. State*, 573 S.W.2d 796, 800-01 (Tex. Crim. App. 1978)).

[7] *Id.* (citing *People v. Krueger*, 412 N.E.2d 537, 540 (Ill. 1980)).

[8] *Id.* (citing *Thompson v. Wainwright*, 601 F.2d 768, 771-72 (5th Cir. 1979) and *State v. Moulds*, 673 P.2d 1074, 1082 (Idaho App. 1983)); *see Davis v. United States*, 512 U.S. 452, 466 & n.1 (1994) (Souter, J., concurring).

The Alaska Supreme Court joined the majority view a few years after *Edwards* was decided, holding in *Giacomazzi v. State* that "when a suspect in custody makes an ambiguous or equivocal statement about wanting an attorney, the interrogating officers 'may seek clarification of the suspect's desires,' so long as the officers do not 'utilize the guise of clarification as a subterfuge for coerc[ing] or intimidat[ing]' the suspect into waiving this right."[9]

The analysis in *Giacomazzi*, however, was based entirely on federal precedent and the federal constitution,[10] and the United States Supreme Court has since rejected the approach adopted in *Giacomazzi*. In *Davis v. United States*, the Supreme Court held that when a suspect has waived their *Miranda* rights and subsequently "makes a reference to an attorney that is ambiguous or equivocal . . . [United States Supreme Court] precedents do not require the cessation of questioning."[11] Rather, in order to require the officers to stop questioning, the suspect "must unambiguously request counsel" — that is, "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[12]

We have previously acknowledged in *Noyakuk v. State* that *Davis* appears to be contrary to the holding of *Giacomazzi*, at least as to a post-waiver, mid-interview reference to an attorney.[13] But we declined to definitively decide that question because

---

[9] *Noyakuk v. State*, 127 P.3d 856, 868 (Alaska App. 2006) (quoting *Giacomazzi*, 633 P.2d at 222).

[10] *See id.* at 869 (noting that *Giacomazzi* was "apparently grounded on federal law").

[11] *Davis*, 512 U.S. at 459.

[12] *Id.*

[13] *Noyakuk*, 127 P.3d at 869.

Noyakuk's request for an attorney occurred *before* his *Miranda* waiver and the *Davis* rule "applies only to a post-*Miranda*-waiver setting."[14]

Here, by contrast, Ridenour's statement about an attorney occurred after his *Miranda* waiver and thus the *Davis* rule applies to Ridenour's federal constitutional claim. Applying that rule, we think it clear that Ridenour's statements were not an unambiguous request for counsel, and we therefore conclude that Ridenour's federal constitutional rights were not violated.

But that is not the end of our analysis. Ridenour is also entitled to protection under the Alaska Constitution, and Alaska courts have interpreted Article I, Section 9 of the Alaska Constitution (the corollary to the Fifth Amendment to the United States Constitution) more broadly than its federal counterpart. As the Alaska Supreme Court explained in *Munson v. State*:

> While . . . the language of § 9 is "virtually identical" to the wording of the Fifth Amendment of the United States Constitution, we have interpreted § 9 more broadly than the U.S. Supreme Court has construed the Fifth Amendment of the Federal Constitution. In so doing, we noted our "responsibility to depart whenever necessary from constitutional interpretations enunciated by the United States Supreme Court and to develop rights and privileges under the Alaska Constitution in accordance with our own unique legal background." We do so because "[w]e are not bound to follow blindly a federal constitutional construction of a fundamental principle if we are convinced that the result is based on unsound reason or logic."
>
> More recently, in *State v. Gonzalez*, . . . the [Alaska] court of appeals expressed hesitation to blindly adhere to changes in federal constitutional law where unexpected decisions of the Supreme Court " 'have forced a serious reevaluation of . . . fundamentals.' " Ultimately, the court concluded that "[t]he United States Supreme Court's decisions interpreting the fifth amendment do not decide the

---

[14] *Id.*

meaning of the Alaska privilege, and similarity in language does not make the United States Supreme Court the primary interpreter of article I, § 9."[15]

In light of our history of interpreting Article I, Section 9 more broadly than its federal counterpart, we now hold that the rule announced in *Giacomazzi*, although no longer valid under the federal constitution, remains the correct rule to apply under our state constitution.

In reaching this conclusion, we rely most heavily on *Giacomazzi* itself. Although *Giacomazzi* only addressed the meaning of the Fifth Amendment to the federal constitution, Alaska courts have traditionally interpreted its Alaska counterpart *more* broadly.[16] There is every reason to believe that, had the question been properly presented, our supreme court in *Giacomazzi* would have interpreted Article I, Section 9 of the Alaska Constitution as similarly requiring that police cease questioning when a suspect makes an ambiguous or equivocal request for counsel, except to clarify the suspect's request.

We also take guidance from Chief Justice Rabinowitz, who wrote in his separate opinion in *Giacomazzi* that "[i]t is not unreasonable to assume that the highest point to which an individual might be able to marshal his courage is that of making a tentative or timid inquiry as to when he will be able to talk to an attorney," and that "[i]f the interrogator can regard this as a 'casual inquiry' to be brushed off, a great deal of the purpose behind *Miranda* and *Edwards* is lost."[17] We agree with these statements. In

---

[15] *Munson v. State*, 123 P.3d 1042, 1049 n.48 (Alaska 2005) (citations omitted).

[16] *See id.*; *see also Beavers v. State*, 998 P.2d 1040, 1046 n.30 (Alaska 2000); *Scott v. State*, 519 P.2d 774, 785 (Alaska 1974); *State v. Gonzalez*, 825 P.2d 920, 931 (Alaska App. 1992).

[17] *Giacomazzi v. State*, 633 P.2d 218, 226 (Alaska 1981) (Rabinowitz, C.J., dissenting). Although Chief Justice Rabinowitz's separate opinion is technically a dissent, he dissented on alternative grounds. The portion of his analysis we quote above is consistent with the reasoning of the full court.

the police-dominated atmosphere of a custodial interrogation, we expect many defendants would struggle to assert their rights in a clear and unequivocal manner. This problem is only compounded if police are allowed, as they seemingly are under *Davis*, to engage in manipulative tactics designed to dissuade a defendant from exercising the rights that properly belong to them.[18]

We note that at least eight other jurisdictions have refused to follow *Davis* as a matter of state law.[19] And *Davis* itself was issued over the strong disagreement of

---

[18] *See, e.g.*, *State v. Purcell*, 203 A.3d 542, 566 (Conn. 2019) (criticizing *Davis* and noting that "[b]y permitting interrogation to continue in the face of an ambiguous invocation of the right to counsel, the police officers faced with such an invocation have been emboldened to employ a wide range of tactics designed to deflect suspects from clearly invoking their right to an attorney").

[19] *See State v. Hoey*, 881 P.2d 504, 523 (Haw. 1994); *State v. Charboneau*, 913 P.2d 308, 317 (Or. 1996); *State v. Chew*, 695 A.2d 1301, 1318 (N.J. 1997); *Steckel v. State*, 711 A.2d 5, 10-11 (Del. 1998); *State v. Risk*, 598 N.W.2d 642, 648-49 (Minn. 1999); *Commonwealth v. Santos*, 974 N.E.2d 1, 14 (Mass. 2012); *Downey v. State*, 144 So.3d 146, 151-52 (Miss. 2014); *Purcell*, 203 A.3d at 544-45.

The most recent state supreme court to reject *Davis* on state constitutional grounds is the Connecticut Supreme Court. In *State v. Purcell*, 203 A.3d 542 (Conn. 2019) the Connecticut Supreme Court surveyed the current state of the law and concluded that the *Davis* majority was flawed in at least three different ways. The first flaw is that the *Davis* majority incorrectly assumed that all suspects understand their *Miranda* rights and the effect of invoking them. *Id.* at 563. But social science research has demonstrated that, notwithstanding the media depictions of *Miranda* warnings, most suspects do not understand their rights and understand even less how to unequivocally invoke those rights. *Id.* at 563-64. This is particularly true of "vulnerable populations, including juveniles, the disabled, and individuals for whom English is not their first language." *Id.* at 564 (internal citation omitted). The second flaw in the *Davis* majority is that the "underinclusiveness of its rule would disadvantage those individuals who are most likely to be subject to the very coercive pressures against which *Miranda* was intended to protect." *Id.*; *see also Davis v. United States*, 512 U.S. 452, 470 n.4 (1994) (Souter, J., concurring) ("Social science confirms what common sense would suggest, that individuals who feel intimidated or powerless are more likely to speak in equivocal or nonstandard terms when no ambiguity or equivocation is meant."). A third, and related, flaw is the failure to recognize the disproportionate impact on certain suspect or quasi-suspect classes of people — such as minorities or women — who more commonly rely on indirect speech patterns. *Purcell*, 203 A.3d at 564-65. The Connecticut Supreme Court also rejected the *Davis* majority's claim

four justices of the United States Supreme Court, who (like Chief Justice Rabinowitz) concluded that the majority's approach was inconsistent with the dictates of *Miranda* and *Edwards*, and threatened to undermine the foundational purpose of those cases.[20]

Applying the approach adopted in *Giacomazzi* to this case, we conclude that Ridenour's post-invocation statements during the November interview should have been suppressed. During his interrogation, Ridenour twice asked whether he should "do this without an attorney," while asking, "Am I hanging myself here?" These constitute ambiguous or equivocal statements about wanting an attorney, and the troopers were required to seek clarification and were prohibited from attempting to coerce or intimidate Ridenour into waiving his right to counsel. But rather than seeking clarification, the troopers told Ridenour that they could not advise him one way or the other and then directly suggested that evidence critical to his defense would not be found if he requested an attorney.[21]

---

that the rule was necessary for effective law enforcement, pointing out that the "stop and clarify" approach provides "a sensible middle ground, allowing law enforcement to dispel ambiguity and avoid guesswork as to the suspect's actual intent." *Id.*

[20] *Davis*, 512 U.S. at 467 & n.1 (Souter, J., concurring).

[21] *See Hampel v. State*, 706 P.2d 1173, 1181 (Alaska App. 1985) ("[T]he need to avoid any undue influence or coercive effect on the accused's right to request the presence of counsel during an interrogation makes it imperative that certain limits be placed on the manner in which ambiguous or equivocal questions concerning the availability of counsel may be answered. We believe those limits are exceeded when an interrogating officer chooses to answer a question in a way which the officer knows or should know will be reasonably likely to discourage the accused from asserting the right to counsel.").

The State argues that the result we reach here is inconsistent with this Court's reasoning in *Noyakuk v. State*, 127 P.3d 856 (Alaska App. 2006), in which we concluded that pre-*Miranda* statements by the troopers did not coerce the defendant into waiving his right to counsel. We disagree. As we explained in our decision in *Noyakuk*, the troopers in that case "never stated or implied that Noyakuk's decision to request an attorney's presence would have adverse consequences for Noyakuk personally, or that any delay in the interview process would be unacceptable to the authorities or would hurt Noyakuk in any other fashion." *Noyakuk*, 127 P.3d at 870. By contrast, the troopers' statements in the

The State does not argue that the admission of Ridenour's post-invocation statements was harmless, and, having independently reviewed the record, we conclude that this error requires reversal of Ridenour's convictions. We note, however, that our ruling only applies to Ridenour's post-invocation statements and that Ridenour's pre-invocation statements remain admissible.

*Why we remand for further findings with respect to the December interview*

Ridenour also raises two challenges to the troopers' conduct at the December interview. First, he argues that if we conclude that his statements in the November interview should be suppressed, we should remand this case for a determination of whether the troopers' conduct in the November interview tainted the December interview. The State agrees that a remand would be required under these circumstances. Because, as we have just explained, we conclude that some of Ridenour's November statements should have been suppressed, we instruct the superior court on remand to consider whether the violation during the November interview tainted the December interview.[22]

Second, Ridenour independently challenges the constitutionality of the December interview, arguing that he was in custody for *Miranda* purposes during that interview, and that the troopers therefore violated *Miranda* when they failed to read him his *Miranda* warnings.[23] We reject this argument.

---

present case suggested that evidence critical to Ridenour's defense would never be found if he invoked his right to an attorney.

[22] *See Halberg v. State*, 903 P.2d 1090, 1098 (Alaska App. 1995) (discussing the factors to be considered when evaluating whether a defendant's subsequent statement is the tainted fruit of a prior illegality).

[23] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

In *Beaver v. State*, we held that even when a suspect is interrogated in prison, a finding of "custody" for *Miranda* purposes still requires proof of coerciveness.[24] We have also recognized that "there is a significant body of case law from other jurisdictions supporting the view that a prison inmate who is interviewed by the police about an unrelated offense will not be deemed to be in *Miranda* custody if the interviewing officers make it clear that the inmate need not participate in the interview, that the inmate can choose to terminate the interview at any time, and that the inmate will suffer no adverse consequences if the inmate decides not to answer the officers' questions."[25]

Here, Ridenour was in custody on an unrelated offense, the troopers made it clear to him that he need not participate in the interview, and they never suggested he would suffer adverse consequences by refusing to participate. Furthermore, the interview was relatively short (between forty-five minutes to an hour) and amicable. Ridenour also occasionally declined to answer certain questions, suggesting an absence of the coerciveness required for a finding of custody under *Miranda*. We acknowledge that Ridenour was handcuffed in a locked room during the interview. But courts have found these factors are not dispositive, especially when the procedures are part of routine practice and when the defendant has acclimated to the prison environment, as was the case here.[26]

---

[24]  *Beaver v. State*, 933 P.2d 1178, 1185-86 (Alaska App. 1997).

[25]  *Noyakuk*, 127 P.3d at 862 & n.4 (collecting cases).

[26]  *See Commonwealth v. Carr*, 986 N.E.2d 380, 397-98 (Mass. 2013) (finding no custody where "the interview occurred in a conference room rather than in his prison cell," and "defendant was in fact less confined during the interview than he would otherwise have been"), *abrogated on other grounds by Commonwealth v. Crayton*, 21 N.E.3d 157, 170 (Mass. 2014); *Baumruk v. State*, 364 S.W.3d 518, 528 (Mo. 2012) (holding that a pretrial detainee was not in custody during meeting with social worker at county jail when there was no "coercive atmosphere" or "coercive questioning techniques," and detainee "could choose not to attend or to leave the meeting at any time"); *State v. Butt*, 284 P.3d 605, 611 (Utah 2012) (holding that a pretrial detainee was not in custody during a brief interrogation

For these reasons, we conclude that Ridenour was not in custody during the December interview, and that the police were therefore not required to give him formal *Miranda* warnings.

### *Why we conclude that the search warrant was insufficiently particular*

Ridenour also challenges the superior court's denial of his motion to suppress evidence obtained during the execution of a search warrant of the trailer home Ridenour occupied together with a number of other people. Although we are already reversing Ridenour's convictions for the reasons stated above, the admissibility of evidence obtained through the search warrant will remain an issue on remand. We therefore address Ridenour's appellate arguments challenging the superior court's ruling.

### *Additional facts*

On November 18, 2015, troopers obtained a warrant to search for certain items in a trailer home in Anchorage where the troopers believed Ridenour was staying. The search warrant described the items to be searched as:

> Clothing and shoes belonging to Ridenour that may have DNA and biological matter on them, a green camouflage backpack, camouflauge [sic] rubber boots, camouflauge [sic] jacket, any firearms, ammunition, items of identification, travel documents (flight tickets, itinerary, baggage claim receipts), any cell phones, or any other electronic devices that have internet capabilities to interact with social media sites.

The warrant also requested "that the seized electronics be forensically examined" and provided that this examination should "include a search for both

---

about an uncharged suspected crime and involving no restraint "beyond his usual status as a jail inmate").

allocated and unallocated (non-deleted and deleted) SMS text messages, MMS messages, photographs, videos, audio files, phone call logs . . . , phone books, instant messages, e-mail, . . . and/or any other electronic evidence relevant to this investigation."

Sergeant Michael Ingram submitted an affidavit in support of the search warrant. Ingram explained that he suspected that Ridenour "was now possibly in the Anchorage area, specifically since [Ridenour had] contacted Krall asking if he could pick up his check." Troopers consulted the Alaska Public Safety Information Network, which revealed that Ridenour had listed a physical address at a trailer home. The troopers observed the residence and saw Ridenour arrive with a green camouflage backpack. They observed Ridenour come out of the residence multiple times, including on one occasion to talk on a cell phone on the front porch. In addition to Ridenour, the troopers observed other people going in and out of the trailer, and there were multiple vehicles at the trailer that were not registered to Ridenour.

Sergeant Ingram's affidavit also stated that Ridenour had been communicating with his family members by phone and electronic messages. The affidavit stated that one of Ridenour's brothers had received an instant message from Ridenour stating he had killed someone in self-defense and that Ridenour had called another brother and told him that he (Ridenour) had killed someone in self-defense. One of Ridenour's brothers provided the investigators with Ridenour's cell phone number.

The search warrant was executed on November 19. During the execution of the warrant, the troopers seized two cell phones. One phone belonged to Ridenour and the other belonged to Rebecca Kragero. Kragero's phone was next to Ridenour's phone when troopers entered the house.

Ridenour filed a motion to suppress the evidence obtained pursuant to the search warrant, arguing that "the search warrant authorizing troopers to seize *all* cell phones found at this trailer lacked specificity in that it authorized troopers to seize cell phones for which probable cause had not been established." The State opposed

Ridenour's motion, and the superior court held an evidentiary hearing. Sergeant Ingram testified at the hearing that he sought authorization to seize any cell phone because Ridenour could use any device to communicate and "he was talking to multiple people."

The superior court denied Ridenour's motion to suppress, finding that the warrant was sufficiently particular. Both cell phones were introduced into evidence at trial; however, only the records from Ridenour's phone appear to have been discussed.

*Analysis*

The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Alaska Constitution state that a warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." Search warrants must be specific, both in particularity and in breadth. "Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based."[27] "Specificity as to the objects at which a warrant is directed serves to protect against the possibility of a general, exploratory search, to assure that articles of property outside the legitimate scope of the warrant are not subject to mistaken seizure, and to reinforce the fundamental rule that seizure of property cannot be permitted in the absence of probable cause."[28] "As a rule, then, search warrants must describe the property to be seized in a manner that is reasonably specific under the circumstances of the given case, so that the policies underlying the particularity requirement may be best effectuated."[29]

---

[27] *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993) (quoting *In re Grand Jury Subpoenas Dated December 10, 1987*, 926 F.2d 847, 856-67 (9th Cir. 1991)).

[28] *Namen v. State*, 665 P.2d 557, 560 (Alaska App. 1983).

[29] *Id.* at 561.

As this Court has previously discussed, "Portable computing devices — laptop computers, tablets, and smart phones — are distinguishing features of modern life. These devices have changed the way we communicate, and they have changed the way we create and store documents, personal communications and correspondence, photographs, and business records."[30] "The prevalence of [digital devices like cell phones and computers] has caused courts to re-think the contours of the Fourth Amendment's prohibition against unreasonable searches and seizures."[31] As the United States Supreme Court explained in *Riley v. California*, a police search of a cell phone "[will] typically expose to the government far *more* than the most exhaustive search of a [person's] house," because a phone "not only contains in digital form many sensitive records previously found in the home," but also "a broad array of private information never found in a home in any form."[32]

In this case, the search warrant authorized the police to seize "any cell phones, or any other electronic devices that have internet capabilities to interact with social media sites" and further authorized those devices to be forensically searched for text messages, e-mails, phone calls, and "*any* other electronic evidence relevant to this investigation" (emphasis added). We conclude that this broad authorization to seize and search any cell phones or electronic devices in the home was insufficiently particular and not supported by probable cause.

At the time troopers applied for the search warrant, they were aware that Ridenour had made phone calls and sent electronic messages admitting his involvement in McCaulley's death. They were also aware of a specific phone number associated with Ridenour. Based on these facts, the troopers undoubtedly had probable cause to seize

---

[30]    *Pohland v. State*, 436 P.3d 1093, 1098 (Alaska App. 2019).

[31]    *Id.*

[32]    *Riley v. California*, 573 U.S. 373, 396-97 (2014).

and search Ridenour's personal phone. They also likely had probable cause to search other electronic devices belonging to Ridenour. But nothing about this information gave troopers probable cause to seize and search cell phones or electronic devices belonging to other members of the household.

The State's arguments to the contrary are not persuasive. According to the State, the troopers had "limited information as to what phones or devices Ridenour was using" and thus "could not have provided more specificity concerning the phones or devices." The State also claims that the troopers had reason to believe Ridenour was suicidal, that they therefore needed to act quickly, and that the troopers could not be certain that evidence would remain in the home after Ridenour's arrest.

As the State acknowledges, however, the troopers were aware of a phone number specifically associated with Ridenour. Thus, even if we were to accept the State's contention that this was a quickly evolving situation that required immediate action, the troopers could easily have provided more specificity concerning the phone Ridenour was using.

The State, however, contends that it was not required to narrow its search to only Ridenour's phone because, according to the State, "the troopers had evidence that Ridenour was using a cell phone or other device to send messages and make calls," and "[f]rom this, it was reasonable to include any cell phone or device accessible to him in the home." In other words, the State contends that the mere fact that Ridenour had used a cell phone or device to send messages and make calls meant that the troopers had probable cause to seize and search *any* cell phone or electronic device located in the home.

We addressed and rejected a similarly broad conception of probable cause in *Pohland v. State*. In that case, the troopers obtained a warrant to search Skye McRoberts's house because they had reason to believe she had committed forgery and

falsification of business records.[33] The search warrant authorized the troopers to seize and search any computer or electronic storage media "capable of concealing documents related to the business and finances associated with [McRoberts]."[34]

Erin Pohland lived in an apartment in McRoberts's house, and the troopers did not have probable cause to believe Pohland was complicit in McRoberts's crimes. But the troopers nonetheless searched Pohland's apartment, and seized and searched a laptop computer belonging to Pohland.[35] The laptop contained thousands of text messages (backup copies of texts from Pohland's mobile phone), which were used against Pohland when she was charged with official misconduct.[36]

Pohland sought suppression of the evidence discovered on her laptop on two separate grounds: that the warrant authorizing a search of McRoberts's house did not encompass Pohland's apartment, and, in the alternative, that the troopers lacked probable cause to believe that Pohland's personal laptop contained evidence relevant to McRoberts's crimes.[37] The district court rejected both arguments.

On appeal, we expressed skepticism as to whether the troopers could lawfully enter Pohland's apartment. But we ultimately declined to resolve that question because we concluded that the troopers lacked probable cause to search Pohland's laptop even if the troopers were lawfully permitted to enter her apartment.[38] We noted that the search warrant application "offered no explanation of why [troopers] thought that McRoberts could gain access to the hard drive of Pohland's laptop computer, even

---

[33]  *Pohland*, 436 P.3d at 1095.

[34]  *Id.* at 1096.

[35]  *Id.*

[36]  *Id.*

[37]  *Id.*

[38]  *Id.* at 1097-99.

if McRoberts had physical access to Pohland's living space," and we explained that "[l]aptop computers are normally equipped with security mechanisms that allow an owner to restrict access to the contents of the laptop by a password or by a similar identification mechanism, such as a fingerprint."[39]

We therefore concluded that "[t]he fact that Pohland's laptop was physically located in a rented apartment within McRoberts's house, and the fact that McRoberts was Pohland's landlord and close friend, does not give rise to the inference that McRoberts had access to the contents of the hard drive in Pohland's laptop."[40]

We reach the same conclusion here: the fact that other phones were located in the trailer home Ridenour had been staying in does not give rise to the inference that Ridenour actually used those phones or that incriminating evidence would likely be found on them.

The State attempts to distinguish *Pohland* on the grounds that although it might be uncommon to use another person's laptop, "it is not uncommon for persons to borrow other persons' cell phones when their own phone is not available or accessible." But this assertion is conclusory, unsupported, and inconsistent with common experience. Much like laptops, cell phones contain sensitive personal information and are normally protected by security mechanisms like passwords or facial recognition. Although a person might occasionally allow a friend or relative to use their cell phone, this is hardly such a common occurrence that it establishes probable cause to seize any phone a suspect might have had access to.

Indeed, even the State does not assert that people use other people's cell phones randomly and without reason. Rather, the State asserts that this typically occurs when a person's "own phone is not available or accessible." But the State has provided

---

[39]  *Id.* at 1099.

[40]  *Id.*

no reason to believe that Ridenour's phone was unavailable to him during the relevant time period, and any assertion that it was would be pure speculation.

Thus, even assuming that people commonly use other people's cell phones when their own phone is unavailable or inaccessible, we would still find an absence of probable cause in this case because the State has provided no reason to believe Ridenour's phone was unavailable or inaccessible to him during the relevant period.[41]

Because the search warrant authorized troopers to seize and search any phones (or other digital devices) in the home, and troopers lacked probable cause to seize and search phones other than the one belonging to Ridenour, we agree with Ridenour that the search warrant was insufficiently particular and not supported by probable cause.

We note, however, that when this issue was litigated in the superior court, Ridenour requested suppression of "[a]ll evidence obtained as a result of this search warrant." We therefore clarify that our decision today is confined to the narrow question of whether the warrant was sufficiently particular and supported by probable cause. We express no opinion as to what extent our conclusion requires suppression of "all evidence" obtained as a result of the search warrant, and we have not received adversarial briefing on that matter in this appeal.[42] If the State elects to retry Ridenour, the parties may continue to litigate this issue.

---

[41] The State also attempts to distinguish *Pohland* on the grounds that, in addition to lacking probable cause, the troopers in *Pohland* exceeded the boundaries of the search warrant when they did not restrict their search of Pohland's laptop to the "business and finance" documents explicitly authorized by the search warrant. *Id.* at 1100. The State asserts that "this issue is wholly absent from Ridenour's case." That may be true, but it is also a wholly separate issue. Its absence from this case has no impact on whether the search warrant application was sufficiently particular and supported by probable cause.

[42] Professor LaFave provides a succinct summary of the issue remaining:

> Assume that a search warrant is issued to search a certain place for several items, but it is later determined that some but not all of those items are described with sufficient particularity, or that

*We need not address Ridenour's arguments concerning his motions for a new trial*

After trial, Ridenour filed two motions for a new trial: the first argued that the verdict was against the weight of the evidence, and the second argued that Ridenour was entitled to a new trial because officers had recorded conversations between him and his lawyer while Ridenour was in jail. Because Ridenour is already entitled to a new trial for the reasons stated above, we need not decide whether Ridenour's motions for a new trial were properly denied.

*Conclusion*

We REVERSE Ridenour's convictions and REMAND this case for further proceedings.

---

probable cause had been established as to some but not all of the items described. Is the entire warrant tainted, so that suppression might be sought as to everything seized in the course of its execution, or is it possible to somehow sever the tainted portion from the sound portion?

2 Wayne R. LaFave, *Search and Seizure* § 4.6(f), at 801 (6th ed. 2020) (footnote omitted).